# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

CHET CYRUS,
BRENDA CYRUS, and
THE ESTATE OF NICKOLOS
WILLIAM CYRUS by BRENDA CYRUS,
Special Administrator,

        Plaintiffs,

    v.                                Case No. 07-C-1035

TOWN OF MUKWONAGO,
VILLAGE OF MUKWONAGO,
FRED WINCHOWKY,
ERIC NELSON,
GRANT TURNER, and
THOMAS CZARNECKI,

        Defendants.

---

# DECISION AND ORDER

---

        This civil rights action arises out of an unfortunate July 9, 2006, encounter between Town of Mukwonago (the "Town") law enforcement officer Thomas Czarnecki ("Czarnecki'), Village of Mukwonago (the "Village") law enforcement officer Eric Nelson ("Nelson"), and Nickolos William Cyrus ("Cyrus").[1] Cyrus died. This action was filed by the Plaintiffs, Chet Cyrus ("Chet"), Brenda Cyrus ("Brenda"), and the Estate of Cyrus (the "Estate"), by Brenda as the special administrator (collectively the "Plaintiffs").

---

[1]Because Cyrus and two of the plaintiffs, his parents, have the same surname, the Court departs from its usual practice of referring to individuals by their surnames. The Court has referred to Cyrus by his surname and his parents by their given names and, collectively, as the Parents. No disrespect is intended by the Court's reference devices.

The Plaintiffs bring this action under 42 U.S.C. § 1983 for violations of Cyrus's Fourth Amendment right to be free from excessive and unreasonable force; Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12131-12165; Section 504 of the Rehabilitation Act of 1973; and, under Wisconsin common law for assault and battery, intentional infliction of emotional distress, and wrongful death arising out of the same factual circumstances as their federal claims. They also include a claim for punitive damages. The Plaintiffs state that each and all Defendants are sued in their individual and official capacities. (Am. Compl. ¶ 12.) They also state that the action is brought against Grant Turner ("Turner") and Fred Winchowky ("Winchowky") in their official capacities. (*See* Am. Compl. ¶¶ 8, 10).

The Court has subject matter jurisdiction over the Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and 1343(a)(3) and (a)(4). Supplemental jurisdiction over the Plaintiffs' state law claims is afforded by 28 U.S.C. § 1367. Venue in this district is proper under 28 U.S.C. § 1391(b).

This matter is before the Court on motions for summary judgment (Docket No. 23) and to exclude the testimony of Dennis Waller ("Waller") and Lynda Biedrzycki ("Biedrzycki") filed by the Defendants Town, Grant Turner ("Turner"), and Czarnecki (collectively the "Town Defendants ) (Docket No. 28) and the motions for summary judgment (Docket No. 34) and to exclude testimony of Waller (Docket No. 31) filed by the Village, Fred Winchowky ("Winchowsky"), and Nelson (collectively the "Village Defendants"). The motions are addressed herein.

2

*Motions to Exclude Testimony*

The Town Defendants seek to exclude the testimony of Waller, the Plaintiffs' liability expert on the issue of the reasonableness of the force used in Cyrus's arrest; and, the testimony of Biedrzycki, the Waukesha County pathologist who conducted Cyrus's autopsy. They assert that the testimony fails to meet the threshold requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

By their motion, the Village Defendants request exclusion of Waller's testimony as it relates to Nelson on the grounds that Waller lacks the requisite qualifications, his methodology is flawed, and his opinion offers an ultimate legal conclusion.

Waller's testimony relates, in part, to Czarnecki's use of a device which is variously referred to as an electronic control device ("ECD"), a taser,[2] and a "stun gun." The device used in this case was a TASER® X26 ECD.

*Standard for Admissibility of Expert Testimony*

Expert testimony is admissible if offered by "a witness qualified as an expert by knowledge, skill, experience, training, or education," and "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. *Daubert* laid the foundation for this rule, which was designed to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."

---

[2]TASER is a registered trademark. The name stems from an acronym created by the original inventor of TASER technology, John H. "Jack" Cover ("Cover"), former chief scientist of North American Aerospace's Apollo Moon Landing Program. Cover's favorite book character was Tom Swift of the Tom Swift Series written by Victor Appleton between 1910 and 1941. One of the books, *Tom Swift and His Electric Rifle*, inspired Cover to create the acronym TASER. *See* http://www.taser.com/company/Pages/trivia.aspx (last visited February 26, 2009).

3

*Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (internal quotation marks omitted).[3]

In applying Rule 702, the appeals court has recognized that "[w]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) (quoting *Smith*, 215 F.3d at 718) (internal quotation marks and citations omitted); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999). "Thus, a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Parra*, 402 F.3d at 758 (quoting *Smith*, 215 F.3d at 718). The proponent of the testimony bears the burden of establishing the testimony's admissibility by the preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

*Daubert* held that the district court must function as a "gatekeeper" to ensure that the offered expert testimony is both relevant and reliable. 509 U.S. at 589. The court of appeals for this circuit has interpreted *Daubert* to require that district courts employ a two-step methodology when determining the admissibility of proffered expert testimony. *Deimer v.*

---

[3] Rule 702 was amended in 2000 to include three specific requirements for expert testimony admissibility, in response to *Daubert* and its progeny. Although Rule 702 has technically superceded *Daubert*, the appeals court for this circuit has consistently referred to *Daubert* for guidance. *See Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006); *Fuesting v. Zimmer, Inc.*, 421 F.528, 534 (7th Cir.), *vacated in part on rehearing*, 448 F.3d 936 (7th Cir. 2005); *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 420 (7th Cir. 2005).

4

*Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 344 (7th Cir. 1995); *Wintz By and Through Wintz v. Northrop Corp.*,110 F.3d 508, 512 (7th Cir. 1997). First, this Court must determine whether the testimony has been subjected to the scientific method; in other words, it must exclude testimony based on "subjective belief or unsupported speculation." *Deimer*, 58 F.3d at 344 (quoting *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614 (7th Cir. 1993)). Second, this Court must determine whether the testimony has a sufficient nexus with the facts of the case and with the relevant inquiry that it will actually assist the trier of fact in understanding the evidence and performing its function as fact-finder. *Id.; see Daubert*, 509 U.S. at 591-92.

<em>Waller</em>

Waller's June 24, 2008, expert report, sets forth four central opinions. He states:

> A. Instead of taking a calm, patient, treatment-oriented approach to assist an individual variously identified as a "crazy boy" "10-96"[4] or mentally ill person, . . . Czarnecki gave <u>forcible commands, applied the TASER twelve times</u> to . . . Cyrus <u>and forcibly held him down in a prone position until he died.</u>

> B. The training provided to members of the Town . . . Police Department with regard to the handling of mentally disturbed persons, positional asphyxia, and excited delirium was inadequate or ignored by . . . Czarnecki with impunity.

> C. The actions of . . . Czarnecki, which were sanctioned, condoned, and ratified by the Town of Mukwonago exhibited a deliberate and reckless indifference for the well-being and rights of . . . Cyrus and other citizens. The conduct of . . . Czarnecki is shocking to the conscience of professional, trained police officers. . . . Czarnecki's conduct was outside of the bounds of acceptable

---

[4]"10-96" is "[a] police term, common in the Midwest, used to describe a person with mental delusions, commonly known as an 'emotionally disturbed person.'" *See* http://www.urbandictionary.com/define.php?term=10-96 (last visited February 26, 2009).

5

conduct in a civilized society and <u>in</u>consistent with state and
nationally accepted standards of police training and practice.

D. Assuming . . . Nelson was aware of the continuing twelve
applications of the TASER to . . . Cyrus by . . . Czarnecki, . . .
Nelson failed to intervene to prevent the unnecessary,
inappropriate and excessive use of force by . . . Czarnecki.

(Hall Aff. Ex. A 4-7).

Waller's report states that he has been retained as consultant or expert witness
in more than 450 cases involving issues relating to police policy, procedure, and practice.
(Hall Aff. Ex. A 1.) Waller has a bachelor of science degree in police administration from
Michigan State University, a master of science degree in public administration from Florida
International University, and over 3,100 hours of law enforcement training. (*Id*.) Since 1991,
Waller has averaged about 40 to 60 hours of law enforcement training per year. (Hall Aff. Ex.
B 39.)

Waller has served as a police officer, field training officer, detective, sergeant,
lieutenant, department training officer, and chief. (Hall Aff. Ex. A 1.) Waller was certified
as a police training instructor in Michigan, Florida, North Carolina, and Wisconsin. (*Id*.) In
Wisconsin, Waller's specialized certification was in firearms and defense or arrest tactics.
(*Id*.)

Waller has not taught in an academy setting in Wisconsin since sometime in
1990 or 1991, and he was uncertain of the current status of his certification as a police
instructor. (Hall Aff. Ex. B (Waller Dep.) 17-18.) Waller last provided law enforcement

6

training for officers in the early 1990s. Waller is qualified by education and experience as a law enforcement expert.

In seeking to exclude Waller's opinions, the Town Defendants contend that Waller has never been trained or certified on the use of an ECD. While Waller has not been certified on the use of an ECD, the record establishes that he received training on the use of a taser in 1999 at two- or three-day course provided by the International Association of Chiefs of Police Course on "less lethal weapons." (Hall Aff. Ex. B 20-21.) Waller viewed a training film on tasers in the late 1990s and has seen videos involving the deployment of a taser in a police confrontation and a training context. (Hall Aff. Ex. B 24-25.) Waller reviewed documents on the use of the ECD. (Hall Aff. Ex. B 62-64.) While Waller is not certified to use an ECD or to train others on the use of an ECD (Hall Aff. Ex. B 60), has not personally witnessed the use of a taser (Hall Aff. Ex. B 25), or published an article on the use of tasers, (Hall Aff. Ex. B 15), the record establishes that Waller is qualified by training and experience to render the opinions set forth in his report. *See NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 790 (7th Cir. 2000) ("[A]n expert is not always required to personally perceive the subject of his analysis." (citing Fed. R. Evid. 703; *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000) (physician was allowed to render expert opinion even though he did not personally examine the subject)).

The opinions rendered by Waller are based, in part, on the application of principles of law enforcement training to the circumstances of this case, which is not subject to traditional scientific methodology. His opinions are grounded in social science which is not

subject to the orthodoxy of traditionally scientific fields. *See Smith*, 215 F.3d at 720-21. Nonetheless, the Court is satisfied that Waller's methodology is adequate.

The Town Defendants seek the exclusion of the four opinions set forth in Waller's report. However, their argument focuses on Waller's first and fourth opinions.

Under Rule 702, expert testimony must be founded on the data. *See Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000). Stated somewhat differently, it is critical "that there be a link between the data and the opinion proffered." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). Waller's first opinion flounders on this requirement. Waller's first opinion is that Czarnecki should have taken a calm, patient, treatment-oriented approach to assist Cyrus instead of giving forcible commands, applying the taser twelve times, and forcibly holding Cyrus down in a prone position until he died.

Waller's written opinion states that Czarnecki "gave forcible commands," and does not acknowledge the undisputed facts that, upon identifying Cyrus, Czarnecki began a verbal dialog. Waller's deposition testimony clarifies his understanding of the initial encounter as follows:

> A. [B]ut I don't disagree or think it's inherently wrong that he walked up towards Cyrus – . . . Cyrus to begin a dialog.
>
> * * * *
>
> The problem I have is when he went from the dialog to force intervention options without having an understanding of what the situation was and based on the understanding only that he was dealing with a mentally ill person.

(Hall Aff. Ex. B at 108). Therefore, the Court will not exclude the opinion on that basis.

8

However, other portions of the factual premise for Waller's opinion lack evidentiary support. The evidence does not support Waller's statement that Czarnecki forcibly held Cyrus down in a prone position until he died. Neither officer put his weight on Cyrus. Czarnecki had his hand on the TASER and was attempting to gain control of Cyrus's arm with the other hand. There is no evidence that Czarnecki held Cyrus down.[5]

The evidence also does not support Waller's conclusion that there were 12 continuing applications of the TASER to Cyrus. The evidence indicates that 12 trigger pulls were recorded by the computer chip. However, the evidence does not establish that the device was **continuously applied** to Cyrus 12 times. Based on the parties' summary judgment submissions the largest number of TASER applications to Cyrus was six, and there is no evidence that such applications were continuous. "[E]xperts' work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff – deploying neither data nor analysis – is not an acceptable methodology." *Lang*, 217 F.3d at 924. Waller's first opinion is not founded on the data and is excluded on that ground.

Waller's second opinion is that the training provided by the Town regarding mentally disturbed persons, positional asphyxia, and excited delirium was inadequate or Czarnecki did not use that training. The Town Defendants state that a fundamental problem with Waller's second opinion is it requires that Waller have some knowledge as to what

---

[5]There is, however, evidence which is not mentioned by either party that Nelson put one knee on Cyrus's shoulder. (Hall Aff. Ex. F 77-78).

Case 2:07-cv-01035-RTR   Filed 04/24/09   Page 9 of 56   Document 67

training was given. (Reply Brief Supp. Defs.' Mot. Exclude 5.) Waller's opinion letter cites specific deposition testimony of Czarnecki regarding the training that was provided to him. (Hall Aff. Ex. A 5-6.) The Court's review of Czarnecki's testimony shows that Waller's summary is accurate. Waller also cited the Town's taser training materials on in-custody death and excited delirium. (*Id.*) Those materials are not included in the submissions currently before the Court. However, at this juncture of the proceedings, the Court is satisfied that Waller had sufficient knowledge of Czarnecki's training. Therefore, Waller's second opinion is admissible.

Waller's third opinion is that Czarnecki's conduct exhibited deliberate and reckless indifference for the well-being and rights of Cyrus and other citizens, is shocking to the conscience of professional, trained police officers, and was outside of the bounds of acceptable conduct in a civilized society and inconsistent with state and nationally accepted standards of police training and practice. Waller's opinion is based upon the Law Enforcement Code of Ethics, which is quoted in Waller's report.

Review of Waller's deposition testimony regarding this aspect of his opinion discloses that it is predicated upon an inaccurate understanding of critical facts. Waller testified that "when Cyrus turned away from him, [Czarnecki] applied the Taser and continuously applied it 12 times while holding [Cyrus] in a prone position while they were attempting to handcuff him and kept him in that position until he died." (Hall Aff. Ex. B 41.) The evidence does not support Waller's statements that Czarnecki applied the TASER continuously, that he applied the TASER 12 times, or that Czarnecki held Cyrus in a prone

position. Waller's opinion does not fit the facts. Thus, Waller's third opinion is excluded on the ground that it does not fit the facts.

The Town Defendants, as well as the Village Defendants, seek to exclude Waller's fourth opinion. Waller's fourth opinion; that is, "[a]ssuming [Nelson] was aware of the continuing twelve applications of the Taser to [Cyrus] by [Czarnecki], [Nelson] failed to intervene to prevent the unnecessary, inappropriate and excessive use of force by [Czarnecki]." Again, the opinion lacks evidentiary support because the evidence does not establish that Czarnecki engaged in 12 continuing applications of the TASER to Cyrus. The evidence also does not support Waller's assumption that Nelson was aware of 12 continuing applications of the TASER. The dispatcher advised Nelson that Czarnecki had tased the suspect before Nelson was at the scene and Nelson knew that Czarnecki had tased Cyrus another time. However, Nelson does not know how many additional times Czarnecki applied the TASER. Nelson heard Czarnecki warn Cyrus several times that he would tase him. However, Nelson did not count those warnings or recall how many times Cyrus was warned. It is also undisputed that Nelson did not hear any taser sounds that morning. Therefore, Waller's fourth opinion in his report does not "fit" the evidence and is therefore excluded on that ground.

Additionally, as argued by the Village Defendants, Waller's opinions and testimony as to legal conclusions on the reasonableness of the force used by Czarnecki and Nelson are inadmissible. The standard for an excessive force claim under the Fourth Amendment is one of "objective reasonableness." What constitutes "reasonableness" when using force while apprehending a suspect is " 'not capable of precise definition or mechanical

application' but 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

In *Thompson v. City of Chicago*, 472 F.3d 444, 458 (7th Cir. 2006), the appeals court upheld the exclusion of expert testimony regarding whether a police officer used excessive force when apprehending a suspect. The court explained:

> [W]hatever insight [the experts] might have had into whether or why Officer Hespe used excessive force would have been of little value except as to possibly causing jury confusion and bore a substantial risk of prejudice. The jury, after having heard all of the evidence presented was in as good a position as the experts to judge whether the force used by the officers to subdue Thompson was objectively reasonable given the circumstances of this case.

*Id.* at 458 (internal citations omitted). Expert testimony on the issue of excessive force was properly excluded because such testimony "would have induced the jurors to substitute their own independent conclusions for that of the experts." *Id.*

Recently, in *Masel v. Mansavage*, No. 07-C-454, 2008 WL 5134916 *2 (W.D. July 2, 2008), this Court sitting in the Western District of Wisconsin, followed *Thompson* and excluded the testimony of the defendant's expert regarding the reasonableness of the officers' conduct in apprehending the plaintiff. The Court held that there was little use in allowing such testimony to reach a jury because it was the jury's own charge to evaluate whether the conduct of the defendant officers was objectively reasonable. In this case, as in *Masel*, 2008 WL

513491 *2, the danger of unfair prejudice in allowing a law enforcement officer to opine on the reasonableness of the conduct of fellow law enforcement officers would counsel against the admission of Waller's opinions on the issue. *See* Fed. R. Evid. 403. Therefore, Waller's first, third, and fourth opinions as set forth in his expert report are excluded. Waller's second opinion is not excluded.

### Biedrzycki

The Town Defendants assert that Biedrzycki's testimony as to the cause of Cyrus's death does not satisfy the criteria for admissibility under Rule 702 of the Federal Rules of Evidence and, therefore, should be excluded under Rule 702 and *Daubert*.[6] The Town Defendants do not question Biedrzycki's general qualifications as a pathology expert, but they assert that her opinion should be excluded because in reaching an opinion on the cause of Cyrus's death she took into account seven factors within the context of the struggle and restraint and concluded that they all caused death. The Town Defendants contend that this is an example of *post hac ergo propter hoc* ("after this, therefore because of this") fallacy.[7]

Biedrzycki candidly stated during her deposition that she does not know what occurred within Cyrus's body during the struggle that would have caused his death. She testified:

---

[6]The Town Defendants noted that Bierdrzcki did not prepare an expert report and intends to rely upon her autopsy report, wherein she certified the cause of death as "Sudden Death during Struggle and Restraint." (Hall Aff. Ex. C 1.)

[7]In so contending, the Town Defendants cite *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 664 (7th Cir. 2005) (complaints followed by termination of employment did not establish retaliation) and *Bermundez v. TRC Holdings*, 138 F.3d 1176, 1179 (7th Cir. 1998) (*post hac ergo propter hoc* argument did not eliminate need to show causation on claim of retaliation for filing an employment discrimination charge.) The Town Defendants have not established that the holdings of *Shafer* and *Bermundez* regarding proof of retaliation for complaints of discrimination are applicable to the analysis under Rule 702.

Q: What is the – when you say sudden death during struggle and restraint, what is the exact mechanism of, for lack of a better term, I'll say injury, that leads to death in that situation?

A: I don't think it's well known.

Q: I would assume that you have the opinion that ultimately [Cyrus] died of cardiac arrest?

A: Ultimately, yes, his heart stopped. Whether that was the primary thing that happened I don't know.

Q: Okay. So the fundamental question is what got from point A to point B being the cardiac arrest, what caused the cardiac arrest...?

A: Well, it started with the struggle and restraint; but all of the physiologic changes that occurred between then, yes, we don't really know.

* * *

Q: Can you say to a reasonable degree of medical certainty what happened inside of [Cyrus's] body on July 9th of 2006 mechanically, to cause his death?

* * *

A: No.

(Hall Aff. Ex. D 49-50; 147.)

Biedrzycki's inability to determine the cause of death was not for lack of diligence in her investigation into relevant issues. She examined the TASER® X26 ECD, she witnessed one being deployed, she reviewed articles and books, met with a representative of Taser International and Dr. Ho ("Ho"),[8] an emergency room physician who had a "list of investigations to be done in clinical trial fashion with Taser," and attended an in-custody death

---

[8]No given name is stated for Ho in the factual materials.

training institute in 2006.  (Hall Aff. Ex. D 37-41, 54-56, 110.)  She also requested a recreation of the restraint.  (Hall Aff. Ex. D 42.)

Within the context of the struggle and eventual death, Biedrzycki identified eight factors that she believes led to Cyrus's death: (1) the exertion and struggle with the officers, (2) panic and fear, (3) prone position, (4) the officers applying pressure to Cyrus's torso and possibly his neck, (5) Cyrus's psychiatric condition, (6) restraint in handcuffs and attempted restraint with leg irons, (7) the pain and panic caused by the deployment of the taser;  and (8) the  actual "EMD"[9] type of force from the taser which played a physiologic role.  (Hall Aff. Ex. D 51-52; 68-69.)   She is of the opinion that these factors are not separable; that is, she does not know whether any of the factors individually could have caused death absent the others or whether any other combination other than all eight could have caused death.  (Hall Aff. Ex. D 108.)   Biedrzycki testified as follows:

> Q: So is that to mean independently you don't think that any of these individually by itself would have caused death in this case?
>
> * * *
>
> A: No, I can't separate it.
>
> Q: Well, would the exertion that you indicated, would that alone absent the fear and panic, absent the position [Cyrus] was in, absent the pressure on the torso, the restraint, the use of the ECD, would that exertion alone, absent all those other factors in your mind, would that have caused death?
>
> A: I can't say.
>
> Q: And that's true of all of these?

_____

[9]Biedrzycki's testimony does not disclose what the acronym "EMD" stands for.

A: Yes. I don't think we can unbundle the package. I mean I really don't think you can. It's just not doable.

Q: But you believe that the combination of all of these factors did cause death?

A: I believe they each provided some input into what occurred.

* * *

Q: Did each one of these provide equal input or do you believe that some of them were more determinative than others? In other words, was the deployment of the ECD more significant than the fear and panic or vice versa?

A: I can't say that either.

(Hall Aff. Ex. D 108-09.)   Biedrzycki's analysis, based on the available resources and available information, indicates that the cause of Cyrus's death cannot be unbundled.

However, the court of appeals for this circuit has made it clear, scientific evidence which supplies nothing except the bottom line is not helpful to the jury.  *See Mid State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989). When scientists appear to testify before the Court, they must adhere to the same standards of intellectual vigor that are demanded in their professional work.  *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996) (upholding exclusion of physician's testimony regarding nicotine patch's role in causing a heart attack).  Biedrzycki may be correct.  However, the "courtroom is not the place for scientific guesswork, even of the inspired sort.  Law lags science; it does not lead it." *Id*. at 319.  Therefore, Biedrzycki's testimony as to the eight factor cause of Cyrus's death is excluded.  This ruling does not exclude her testimony regarding her autopsy of Cyrus and her objective findings during that autopsy or the contents of her autopsy report.

16

*Summary Judgment Motions*

The Town Defendants and the Village Defendants have filed separate motions for summary judgment, briefs, and proposed findings of fact. However, the relevant facts that underlie both motions overlap in large part and many of the proposed findings of fact submitted by Town Defendants and Village Defendants are similar and rely upon the same evidentiary material. (*See* Bitar Aff. ¶ 3.) Of course, to some extent, the proposed findings of fact presented by each group of defendants includes proposed facts specific to that particular group of defendants. The Court has combined the two sets of proposed findings of fact to create a single chronology of the relevant events.

*Standard of Review*

In deciding the Defendants' motions for summary judgment, the Court applies the following standards. When considering a motion for summary judgment, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A party "opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248; also citing

*Celotex Corp.*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *United States v. Rode Corp.*, 996 F.2d 174, 178 (7th Cir. 1993)).

"Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587.

Failure to respond to a summary judgment motion does not automatically result in judgment against the non-moving party. *See Cunningham*, 30 F.3d at 883. "A party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant." *Id.* (citations omitted).

Rule 56(e)(1) also addresses the opposing party's obligation to respond stating "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Furthermore, in determining the material and undisputed facts, the Court has disregarded those proposed findings of fact and responses that constituted legal conclusions,

were argumentative or irrelevant, were not supported by the cited evidence, or were not supported by citations specific enough to alert the Court to the source for the proposal. (*See* Pls.' Resp. Town Defs.' Proposed Findings of Fact ("Pls. Resp. TPFOF") ¶¶ 47, 49 (citing Simon Aff., Exhibit B (74-page transcript of Bradford P. Williams ("Williams") deposition testimony); (*See also*, Pls.' Resp. Village Defs.' Proposed Findings of Fact ("Pls. Resp. VPFOF") ¶ 73 (citing 148-page transcript of Biedrzycki deposition.) The Court also notes that under this Civil Local Rule 56.2, the Plaintiffs' "mere disagreement with the movant's asserted facts is inadequate [to defeat summary judgment] if made without reference to specific supporting material." *See Montano v. City of Chi.*, 535 F.3d 558, 569 (7th Cir. 2008) (quoting *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003)).

The Court also has disregarded factual statements in briefs that were not included in the proposed findings of fact. *See* Town Defs.' Br. Supp. Summ. J. 11 (Czarnecki's initial exchange with Cyrus took less than two minutes before Cyrus began running toward the house (citing Hall Aff. Ex. E 72.); 12 (Williams estimated it was 30 seconds between the first ECD deployment and when Nelson arrived (citing Hall Aff. e.g. 63.).)

*Relevant Facts*[10]

Background

At the time of his death, Cyrus was a 29-year-old male who had previously been diagnosed with mental illness. Cyrus resided with his parents at their home in Mukwonago, Wisconsin. Cyrus's treating psychiatrist, Dr. Basil Jackson ("Jackson"), diagnosed Cyrus's illness as bipolar disorder, but noted some similarities to schizophrenia in Cyrus's symptoms. Cyrus was treated with Zyprexa, an anti-psychotic drug. In the years preceding his death, Cyrus had exacerbations of his illness that resulted in police intervention.

Czarnecki, who has been a certified police officer since 1995, was a member of the Town police department at all times relevant to this action. (Am. Compl. ¶ 9; Town Defs.' Ans. Am. Compl. ¶ 9.) As a result of Cyrus's earlier mental health exacerbations, Czarnecki had prior involvement and contact with Cyrus, but without incident or complaint.

As of July 9, 2006, Czarnecki was a sergeant. Thereafter, Czarnecki became a lieutenant. Czarnecki has an associate's degree in police science and completed the required 400 hours of police officer recruit training. As a law enforcement officer, Czarnecki also completed training to become certified in the use of ECDs which required that he attend a course taught by Town law enforcement officer, Craig Ketola ("Ketola"). Czarnecki completed the course on June 6, 2006, and after that, he was certified to carry and use a taser as an officer. Cyrus was the first person on whom Czarnecki deployed a taser.

---

[10]Unless otherwise stated, the relevant facts are based on the Town Defendants' proposed findings of fact ("TPFOF") and the Village Defendants' proposed findings of fact ("VPFOF") to the extent they are undisputed. Citations to quoted excerpts are included even if they are undisputed.

At all relevant times to this action, Turner was the Chief of the Town police department. (Am. Compl. ¶ 8; Town Defs.' Ans. Am. Compl. ¶ 8.) The Town is a municipal entity organized under the laws of the State of Wisconsin. (Am. Compl. ¶ 7; Town Defs.' Ans. Am. Compl. ¶ 7.) The Town is a public agency which receives federal financial assistance. (Am. Compl. ¶ 53; Town Defs.' Ans. Am. Compl. ¶ 53.)

Since October 1999, Winchowky has been the Village police chief. From 1988 until becoming its chief, Winchowky served as a lieutenant for the Village police department. The Village is a municipal entity organized under Wisconsin law. (Am. Compl. ¶ 7; Village Defs.' Ans. Am. Compl. ¶ 7.) There is a mutual aid agreement between multiple municipalities in Western Waukesha County where the Town and Village are located. (Bitar Aff. Ex. J (Winchowsky Dep.) 6-7.)

Nelson has been employed as a police officer by the Village police department since 1993. Nelson has never deployed his taser. Nelson's training and experience provides that he should approach all individuals in a similar manner when first encountering them.

Nelson has been trained in the use of force continuum. An officer moves along the use of force continuum as it "becomes apparent that [a step is] either ineffective or not appropriate." (Hall Aff. Ex. F 49.) The first stage calls for near presence to gain a certain level of compliance. When presence is not adequate to gain compliance, an officer may use verbal commands in order to gain compliance. When presence and verbal command do not achieve compliance, an officer may "move up" the use of force continuum until he obtains the compliance that is necessary to control the subject. (Hall Aff. Ex. F. 22.) Because an officer

21

may not know whether an individual has a mental illness, the same sequence with respect to the use of force continuum is followed with all persons.

The purpose of using ECDs is to cause incapacitation and pain in order to gain compliance. Town had written policies regarding the use of force and the appropriate use of the ECD.

On July 9, 2006, Czarnecki was carrying a TASER® X26 ECD. This device, like most, if not all, ECDs has two methods of operation. The first manner in which an ECD can be deployed is through a trigger-pull leading to the deployment of two probes from a cartridge. When the two probes make contact with a body, a circuit is completed between the probes, which leads to an electrical current passing through the surface of the body between the two probes. The current will continue to pass between the probes for as long as the trigger is pulled or up to five seconds.

The second manner in which an ECD can be deployed is through the use of a "drive-stun" mode. (Ketola Aff. ¶ 7.) If officers are in close range to a subject or if the cable between the probes breaks, officers can press the taser against the subject's body and pull the trigger. The taser itself has the ability to connect a circuit when at close proximity, approximately one and one-half inches. The drive-stun mode uses pain to achieve compliance. It affects a small area of the body. The use of the ECD in the drive-stun mode is limited to a maximum five second deployment for each trigger pull. (Ketola Aff. ¶ 10.) The TASER®X26 used in this case contains a computer chip that records a date and time of every trigger pull.

*July 8, 2006*

On July 8, 2006, Cyrus was experiencing an exacerbation of his underlying psychiatric condition, when members of the Rock County Sheriff's Department found him wandering along the side of the interstate in a delusional state. After being transported to the Rock County Mental Health facility, Cyrus was released to the custody of his mother, Brenda.

Cyrus apparently continued to suffer exacerbation of his mental illness upon return to the custody of his parents. After returning to his home, Cyrus removed his clothing except for a bathrobe and ran away on the evening of July 8, 2006. His parents contacted the Village police department, which began searching for Cyrus. When Brenda contacted the Village police department, she stated that she wanted Cyrus taken into custody and did not want him returned to their home.

Nelson assisted Officer Heckman ("Heckman"),[11] a Town police officer, in the search. Heckman told Nelson that "the reason for [Cyrus] leaving was that he had a confrontation with his mother that evening and he fled the home wearing nothing but a bathrobe." (Hall Aff. Ex. F (Nelson Dep.) 7.) Heckman also told Nelson that "they had been called to [Cyrus's] residence several times, and that he was an adult living with his parents, and that he had some type of mental issues that were controlled or not controlled by medication." (Hall Aff. Ex. F 8.) Based on the information he obtained during the search for Cyrus, Nelson "assumed [Cyrus] was agitated at a minimum." (Hall Aff. Ex. F 9.) Nelson

---

[11]Heckman's given name is not disclosed in the proposed findings of fact or the cited factual materials.

Case 2:07-cv-01035-RTR   Filed 04/24/09   Page 23 of 56   Document 67

had only one prior contact with Cyrus when he issued Cyrus a traffic citation in the 1990's. Throughout the night, officers were not able to locate Cyrus.

*July 9, 2006*

At about 7:45 a.m. on July 9, 2006, Village dispatchers received a call from a homeowner, Bradford Williams ("Williams"), indicating that there was a man in his home who was not acting in a normal manner. The dispatcher dispatched Czarnecki to the Williams home.

As Czarnecki traveled to the scene, the dispatcher informed him that the man was in the Williams home, but that he was going "back and forth" between the inside of the home and a garbage dumpster located outside the home. (Hall Aff. Ex. E (Czarnecki Dep.) 58-59.) Upon arrival, Czarnecki, based on his prior contact with Cyrus, was able to positively identify Cyrus as the intruder. He was also aware that Cyrus had been missing for several hours. Czarnecki did not know whether anyone was inside the home.

After exiting the squad car, Czarnecki noticed Williams down at the end of his driveway and saw Cyrus on the Williams property closer to the home. After identifying Cyrus, Czarnecki began a verbal dialog. He immediately identified himself to Cyrus, "took an open stance," and asked Cyrus to stop and come to him near the street and away from the home to talk. (Hall Aff. Ex. E 41.) Czarnecki asked Cyrus to identify himself and if he belonged on the property. Cyrus responded that he lived at the property and that his brother lived next door. Based on his past experience with Cyrus, Czarnecki knew that Cyrus's statements were not accurate.

24

Czarnecki replied he had been called to the scene because someone was on the wrong property. Cyrus then told Czarnecki that he was on private property and he needed to leave. Throughout this initial conversation, Czarnecki was gesturing "in a manner to invite Cyrus to walk away from the home and to come and talk to him." (VPFOF ¶ 46.)

Williams described Czarnecki's initial interaction with Cyrus as follows:

Q: Okay. So would it be fair to say then that [Czarnecki] was not yelling? If he was yelling, would you have been able to hear?

\* \* \*

A: Yes. No, he was very calm. And I could tell from what — because he didn't have his back to me. They were kind of on the side, so I could see that he was trying to calm [Cyrus] down, because he was walking in circles . . . It appeared to be that [Cyrus] was being belligerent and that – I don't even know this officer's name, but he was very calm. And I could tell he was giving some kind of command to settle down or to come with him or whatever it was.

(Hall Aff. Ex. G 24-25.)

After this conversation, Cyrus turned around so that his back was to Czarnecki and he was running into the house. Czarnecki unholstered his TASER and deployed the device striking Cyrus in the back, causing Cyrus to fall to the ground.

Czarnecki was questioned at his deposition regarding the timing of his decision to deploy the TASER. Czarnecki stated that he viewed Cyrus's turning around away from him and running toward the house as "potentially dangerous." (Hall Aff. Ex. E 60.) More specifically, Czarnecki deployed the TASER because he knew that before he had arrived at the scene, Cyrus had been going back and forth between the house and the dumpster outside and Czarnecki was concerned that Cyrus might have been getting a weapon or something that

could be used as one.  He also knew that there already had been a confrontation between Williams and Cyrus.  Additionally, Czarnecki was unaware of whether there was anyone else in the house who might be in danger if Cyrus re-entered the home.  Czarnecki also indicated that, from a tactical perspective, it is much safer to take someone into custody in the outdoors as compared to entering an unfamiliar and partially unfinished home.

When Czarnecki initially deployed the TASER, he knew that he had backup on the way from the Village.  Prior to taking further action, Czarnecki decided to wait for backup.

Czarnecki was the only Town officer on duty at the time, but it was Village's policy to send a back-up officer in such situations.[12]  Although the call site was in the Town, Nelson was dispatched by the Village because he was available.  This mutual assistance was consistent with past practices of both departments.

The dispatcher communicated to Nelson that he should go to the Williams address.  Nelson heard Czarnecki's response to the same dispatch and the dispatcher's comments to Czarnecki.  Nelson recalled that the dispatcher provided him information that the police department had received a 911 call from a homeowner "who was confronted by a party when he had responded to his home that morning and that party did not belong there."  (Hall Aff. Ex. F 5-6.)  Nelson did not know that the suspect was Cyrus; however, he believed that it was "possible" that it was Cyrus.  (Hall Aff. Ex. F 6-7.)  As Nelson was dispatched to the scene, he thought "at this point in time we're responding to an incident where there is a man

---

[12]This statement is based on paragraph 38 of the Village Defendants' proposed findings of fact.  However, the Village Defendants referred to the Town having the policy of sending backup, while the cited deposition testimony addressed the policy of the Village.

that's half naked in a home that's not his." (Hall Aff. Ex. F 10.) Prior to his arrival, Nelson

heard over dispatch that Czarnecki had tased Cyrus.

While waiting for Nelson, Czarnecki stood approximately ten feet away from

Cyrus as he lay on the ground. Czarnecki instructed Cyrus to show his hands and to put his

hands behind his back. Cyrus again did not comply with Czarnecki's commands.

Some time after the initial taser deployment, Cyrus began barrel rolling.[13] It is

undisputed that Czarnecki deployed the TASER a second time. Regardless of whether the

second taser deployment came before or after Cyrus was barrel-rolling, the officers' testimony

was consistent in that they continued to give commands to Cyrus to provide his hands for

handcuffing but that he refused to comply.

Czarnecki testified that he is unable to recall whether, when he pulled the trigger

on the TASER the second time, he attempted to use the device again through the probes or

whether he thought the probes' wire had broken and, as a result, used the device in the

drive-stun mode.

Nelson entered Williams' cul-de-sac and saw Czarnecki standing in the front

yard with his TASER in his hands at a "low ready" position and Cyrus face down on the

ground. (Hall Aff. Ex. F 10.) Nelson approached the scene in the front yard and Czarnecki

immediately gave him a brief update on the situation. Czarnecki said "he had a brief

---

[13]There is a genuine dispute of fact as to when Cyrus began barrel-rolling. According to Williams, Cyrus began barrel-rolling before Nelson arrived. (Simon Aff. Ex. B (Williams Dep.) 29:21-55.) According to Czarnecki, Cyrus began barrel-rolling after Nelson arrived at the scene and drove his squad car up the Williams driveway. (Hall Aff. Ex. E 74.) Nelson believes that Czarnecki pulled the trigger on the taser and then Cyrus began to barrel-roll. In Nelson's opinion, "I believed that he was tased and attempted to roll away from the stimulus, break the leads." (Hall Aff. Ex. F 13-14.) This factual dispute is not material.

confrontation or verbal exchange, he tried to give Cyrus some commands and he ignored them, refused to comply, turned and began leaving the area going back toward the house." (Hall Aff. Ex. F 11.) Cyrus got up, stumbled and fell in front of Nelson's squad car. (Hall Aff. Ex. G 31.)

The officers continued to order Cyrus to provide his hands for handcuffing, but Cyrus did not comply. The officers forcibly attempted to remove Cyrus's hands from under his body for handcuffing. Czarnecki took a position on Cyrus's left side and Nelson took a position on Cyrus's right side. Czarnecki attempted to gain control of Cyrus's arm with one hand and had his other hand on the TASER.

The officers continued to give commands to Cyrus directing him to quit resisting and to provide his hands for handcuffing. Czarnecki continued to warn Cyrus that he would deploy the TASER again if Cyrus did not comply. Cyrus continued to disregard the officers' commands. After unsuccessful attempts to pull Cyrus's arms out from under him, Czarnecki deployed the TASER in the drive-stun mode to Cyrus's back.

Throughout the entire struggle, which according to Williams lasted about a minute, Cyrus continued to resist and did not comply with the officers' requests for his hands. As a result, Czarnecki deployed the TASER in unison with Nelson's attempts to pull Cyrus's arms from under him. Nelson got Cyrus's right arm out from under him and handcuffed it.[14]

_____

[14]There is a genuine factual dispute about the extent to which the TASER application resulted in Nelson's extrication of Cyrus's right arm. The Plaintiffs contest paragraph 70 of the Village's proposed findings of fact that states: "As a result of the effect of the 'drive stun' application of the taser by [Czarnecki], [Nelson] managed to pull one of Cyrus'[s] arms from underneath and handcuff that hand. Czarnecki Dep. p. 80." The Plaintiffs state that there is no evidence of record that the tazing of Cyrus had anything to do with Nelson being able to remove Cyrus's hand. (*See* Pls.' Resp. VPFOF ¶ 70.) Page 80 of the Czarnecki deposition, cited by the Village does not support the Village's proposed fact and therefore it has not been included. Paragraph 67 of the Town's proposed findings of facts states: "As a result of the combined affect of the ECD and Officer Nelson's efforts, Officer Nelson was first able to

After Cyrus's right arm was handcuffed, Czarnecki and Nelson switched sides so that Nelson could handcuff Cyrus's left hand. Nelson continued to attempt to pull Cyrus's arm out from under him.

The officers continued to give Cyrus commands to provide his hands for handcuffing. Cyrus continued to refuse to comply with their directive and actively resisted the officers' efforts to gain control of his arms. Czarnecki also continued to warn Cyrus that his continued resistance would lead to the TASER being deployed again. Despite the multiple commands from both officers and warnings by Czarnecki that he would deploy the TASER, Cyrus's resistance did not stop.

Nelson believes that throughout the handcuffing process, Cyrus was actively resisting apprehension. Specifically, Nelson stated that "[Cyrus] didn't willingly show his hands nor when I tried to remove his hands from underneath him did he allow me to . . . In my opinion it was active resistance to apprehension." (Hall Aff. Ex. F 24.)

While the officers had Cyrus on the ground, Nelson "wasn't watching Czarnecki what he was doing." (Hall Aff. Ex. F 30.) Nelson "was more concerned with Cyrus's hand, trying to get his hand out and concerned with what I was doing." (*Id*.) Nelson explained "[controlling someone's hands is extremely important. There aren't many people that can fight you by means of other extremities of their bodies. So securing his hands is extremely important." (Hall Aff. Ex. F 41.)

---

get [Cyrus's] right arm out and handcuffed. (Hall Aff. Ex. E at 80.)" The Plaintiffs responded that they agree with paragraph 67 of Town's proposed findings of fact. (*See* Pls.' Resp. TPPOF ¶ 67.) The factual dispute, though genuine, is not material.

The officers did not strike or kick Cyrus during the encounter. Neither officer put their weight on Cyrus while they were attempting to arrest him. Williams did not believe that any abuse took place at any time.

Nelson does not know how many times Cyrus was drive stunned. Nelson heard Czarnecki warn Cyrus several times that he would tase him but Nelson did not "count" the number of warnings. (Hall Aff. Ex. F 75.) A taser makes very little, if any, audible sound. Nelson did not hear any taser sounds that morning.

It is unclear exactly how many times the TASER was deployed in this case. Czarnecki recalls using the TASER once through the probes and four times in drive-stun mode for a total of five deployments. Nelson's testimony suggests that the TASER was deployed twice through the probes and four times through the drive-stun for a total of six deployments. Biedrzycki, the medical examiner, concluded that the TASER was deployed six times. The TASER® X26 used in this case had internal computerized recorder registered a total of twelve trigger pulls.

After Cyrus had been handcuffed, the ambulance was requested on a non-emergency basis. However, after the officers rolled Cyrus over onto his back and they noticed that he was not breathing, his face was ashen, and he was non-responsive, Czarnecki immediately radioed for the ambulance to "step it up." (Hall Aff. Ex. E at 78.) Cyrus never regained consciousness and was formally pronounced dead at the hospital. Subsequent to the death, an investigation was conducted by the Waukesha County Sheriff's Department.

Waller said it would not be inappropriate to attempt to use the "drive stun" a couple of times to determine if it would work as a compliance technique. Throughout his deposition, Waller recognized that an officer's response is situational and depends on the totality of circumstances. For example, when discussing his criticism of Czarnecki, Waller stated: "situationally, it would depend on, you know, one of the first things he should have had or could have done was ask [Williams] what happened, is there anybody else in the house." (Hall Aff. Ex. B 95-96.)

In Wisconsin, officers do not receive any training on the use of force that differentiates the level of intervention options to effectuate an arrest on a person who has mental illness as compared to a person that does not have mental illness. There is no training provided to officers with regard to diagnosing excited delirium in the field. Nelson testified that he approaches all persons and episodes equally. Officers in Wisconsin receive training to effectuate an arrest on a person who has a mental illness in the same manner as a person without mental illness.

In a letter dated September 8, 2006, Waukesha County District Attorney Paul Bucher ("Bucher"), in reviewing the investigation of the death of Cyrus, complimented both police departments for "an excellent job." (Bitar Aff. Ex. M.) Bucher further stated:

> The professionalism that was displayed by officers by your Department should make you both proud. Both officers remained cool under some very difficult and trying circumstances. I know that this is a difficult time, especially for [Czarnecki.] I know his family was also, no doubt, adversely affected by this. I wish there would have been another way to handle this, but I don't believe that there was. Waukesha County can be proud of its law enforcement tradition. That is in large part because of the

31

dedicated men and women who make up the ranks of the law enforcement agencies in this county. . . . Both individuals [Czarnecki and Nelson], in my opinion, acted professionally, passionately and swiftly under some very difficult circumstances. In addition, their conduct during the Inquest was nothing but professional, and well prepared. Being a law enforcement officer is not an easy task. Both of these individuals, however, in my opinion, epitomize professional and dedicated law enforcement in Waukesha County. . . . Based upon my review of the evidence and the record in this case, this office will not be filing any charges in this matter, and will accept the jury's finding of a justifiable use of force. This matter is closed.

(*Id.*)

### *Analysis*

#### *ADA and Rehabilitation Act Claims*

The Defendants seek dismissal of the Plaintiffs' ADA and Rehabilitation Act claims relying upon *Hainze v. Richards*, 207 F.3d 795, 799-803 (5th Cir. 2000).[15] The Village Defendants also rely on *Buchanan ex rel. Estate of Buchanan v. Maine*, 417 F. Supp. 2d 45, 72-74 (D. Me. 2008) and assert that there is no individual liability in an action for money damages under Title II of the ADA, citing *Walker v. Snyder*, 213 F.3d 344, 346 (7th Cir. 2000).

In opposing dismissal of such claims, the Plaintiffs maintain that the Court should adopt the test set forth in *Lewis v. Truitt*, 960 F.Supp. 175, 178 (S.D. Ind. 1997) to evaluate their claims under the ADA and the Rehabilitation Act.

---

[15]The Village Defendants state that they adopt the arguments of the Town Defendants. (Village Defs.' Br. Support Mot. Summ. J 23.)

The Plaintiffs' ADA claim arises under Title II, commonly referred to as the public services portion of the ADA, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefit of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. *See Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 750 (7th Cir. 2006). The statute defines a "public entity" as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12132(1)(B). Similarly, Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).[16] *See Wis. Cmty. Servs., Inc.*, 465 F.3d at 746.

*Entities Liable*

The Court begins with consideration of whom may be liable for a Title II or Rehabilitation Act violation. The Plaintiffs have named all the Defendants in their Title II and Rehabilitation Act claims. However, Title II of the ADA does not authorize suits against individual officials in their individual capacities. *Walker*, 213 F.3d at 346 (overruled on other grounds by *Board of Trs. v. Garrett*, 531 U.S. 356, 374 n.9 (2001)). Furthermore, the

---

[16]The record does not contain any evidence that the Village receives federal funds and, in its answer, the Village did not admit that it receives such funds. However, the Village has not raised the issue in its summary judgment submissions.

Rehabilitation Act authorizes suits only against federal fund recipients. *See* 29 U.S.C. §§ 794, 794a; *Grzan v. Charter Hosp.*, 104 F.3d 116, 119-20 (7th Cir. 1997). There is no evidence that the four individual defendants are the recipients of federal funds. Therefore, the Plaintiffs' ADA and Rehabilitation Act claims against Winchowky, Nelson, Turner, and Czarnecki in their individual capacities are dismissed.

*Viability of Claims*

There remains to be addressed the viability of the Plaintiffs' claims against the Town and Village, and Winchowky, Nelson, Turner, and Czarnecki in their official capacities.[17] Because the provisions of the ADA and the Rehabilitation Act are nearly identical, the Court largely limited its analysis to the ADA. *See Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004).

To establish a Title II ADA claim, the Plaintiffs must establish that Cyrus: (1) was a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of Cyrus's disability. *See Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 843 (7th Cir. 1999). Discrimination under Title II of the ADA "may be established by evidence that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3)

---

[17]The Plaintiffs' official capacity claims against Winchowsky, Nelson, Turner, and Czarnecki are claims against the governmental entities themselves – the Town and Village. *See Gossmeyer v. McDonald*, 128 F.3d 481, 494 (7th Cir. 1997) ( "An official capacity claim against an individual defendant constitutes a claim against the government entity itself.").

the defendant's rule disproportionately impacts disabled people." *Id.* at 847. The appeals court has rejected "the suggestion that liability under Title II of the [ADA] must be premised on an intent to discriminate on the basis of disability." *Id.* at 846; *see also Wis. Cmty. Servs.*, 465 F.3d at 753.

Neither the Court of Appeals for this Circuit nor the Supreme Court have addressed the applicability of the ADA (or the Rehabilitation Act) to law enforcement services. However, other Circuit Courts of Appeals have considered the protections of the ADA or the Rehabilitation Act in the context of the law enforcement activities. *See Waller ex rel. Estate of Hunt v. City of Danville, Va.,* 556 F.3d 171, 173-76 (4th Cir. 2009); *Sanders v. City of Minneapolis, Minn.,* 474 F.3d 523, 527-28 (8th Cir. 2007); *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1081-89 (11th Cir. 2007), *Thompson v. Williamson County, Tenn.*, 219 F.3d 555, 557-58 (6th Cir. 2000); *Hainze*, 207 F.3d at 795; *Gohier v. Enright*, 186 F.3d 1216, 1219-22 (10th Cir. 1999); *Gorman v. Bartch*, 152 F.3d 907, 910-14 (8th Cir. 1998).

In the context of arrests, courts have recognized two types of Title II claims: (1) wrongful arrest, where police arrest a suspect based on his disability, not for any criminal activity; and (2) reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees. *Waller*, 556 F.3d at 174 (citing *Gohier*, 186 F.3d at 1220-21; *Gorman*, 152 F.3d at 912-13 (holding that a paraplegic arrestee could make out a reasonable accommodation claim under the ADA after being injured in a police van not equipped with wheelchair restraints)).

Some courts have held that Title II contains an "exigent circumstances" exception that absolves public entities of their duty to provide any reasonable accommodation. *Waller*, 556 F.3d at 174-75 (citing *Waller v. City of Danville*, 515 F.Supp. 2d 659, 664 (W.D. Va.2007); *Hainze*, 207 F.3d at 795[18]). In *Waller*, the court determined that it need not decide whether there was an exigent circumstance, rather it stated: "reasonableness in law is generally assessed in light of the totality of the circumstances, and exigency is one circumstance that bears materially on the inquiry into reasonableness under the ADA. Accommodations that might be expected when time is of no matter become unreasonable to expect when time is of the essence." 556 F.3d at 175.

The Defendants urge this Court to adopt the approach of *Hainze*, contending that the "ADA and Rehabilitation Act should not even be applied to law enforcement officers who are engaged in rapidly evolving situations," like that presented to Czarnecki and Nelson on July 9, 2006. (Br. Supp. Defs.' Mot. Summ. J. 7). *Buchanan*, 417 F.Supp. 2d at 72-73, relied upon by the Village Defendants, analyzes an ADA claim under both a wrongful arrest theory and a reasonable accommodation theory. (On the reasonable accommodation theory, *Buchanan* followed the Fifth Circuit's approach in *Hainze*.)

The Court need not address the *Hainze* exigent circumstances approach, because in arguing their ADA and Rehabilitation Act claims, the Plaintiffs assert only a theory of

---

[18] n *Hainze*, the Fifth Circuit held that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." 207 F.3d at 801. *Hainze* held that requiring officers to consider ADA compliance in such situations would risk public safety; in *Hainze*, the suspect came toward police across a parking lot, brandishing a knife and refusing orders to halt. *Id.* at 797, 801. Therefore, officers had no duty to accommodate his mental illness before securing the scene and ensuring public safety. *Id.* at 801.

wrongful arrest relying on *Truitt*, 960 F.Supp. at 178.[19]  Thus, the Court will consider *Truitt*.

In *Truitt*, the district court denied summary judgment on the plaintiff's ADA claim holding that the plaintiff could recover if he could show that (1) he was disabled, (2) the defendants knew or should have known he was disabled, and (3) the defendants arrested him because of legal conduct related to his disability.  *Id.* at 178.  One of the *Truitt* plaintiffs was the paternal grandfather, Charles Lewis ("Lewis"), who was deaf.  Lewis, brought an action under the ADA, after he was arrested when law enforcement officers arrived at his home, at the request of the maternal grandmother, to transfer the custody of Lewis's granddaughter to the maternal grandmother.

The undisputed facts established that at least one of the officers should have known Lewis was deaf.  The officers made no effort to communicate with Lewis on paper as recommended by Lewis's friends who were present at Lewis's home.  *Id.* at 178-79.  Lewis was allegedly assaulted by the law enforcement officers.  *Id.* at 176.

The facts of this case are distinguishable from those of *Truitt*, 960 F.Supp. at 176.  Lewis was lawfully in his home and the officers entered his home without consent or a warrant.  *Id.*  The officers also would not believe information provided by others at home that Lewis was deaf.  *Id.*

Unlike the circumstances of *Truitt*, Cyrus was engaging in illegal conduct by trespassing on the Williams property.  Czarnecki was aware that Cyrus had a mental illness

---

[19] The court recognizes that the district court's holding in *Truitt*, is not binding upon it.  However, the court of appeals has not ruled on the issue and the theory recognized in *Truitt*, has been acknowledged by the Court of Appeals for the Fourth, Eighth and Tenth Circuits.  *See also*, *Spencer v. Dawson*, No. 04-C-5048, 2006 WL 3253574 *11 (N.D. Ill. Nov. 7, 2006).

and initially approached him in a calm non-confrontational manner. Cyrus would not acknowledge that he had no right to be on Williams property and declared it to be his property. He would not leave the property despite Czarnecki's request that he depart.

Nelson was also aware that Cyrus had a mental illness, he was missing, and that local law enforcement officers had been searching for him. However, Nelson was present at the scene because he was responding to the call for a backup officer to assist Czarnecki in responding to the Williams 911 call report of a trespasser.

Construing the facts and the reasonable inferences from those facts in the light most favorable to the Plaintiffs, the Court accepts that Cyrus's presence on Williams property and his responses and conduct with respect to the officers was the result of mental illness. However, the fact remains that Cyrus did not have a lawful right to be present on Williams property.

To afford the Plaintiffs a remedy under these circumstances would exceed the intended scope of the ADA and the Rehabilitation Act because it would shield the disabled from being treated like other citizens who violate the law. Therefore, as a matter of law, the Plaintiffs' ADA and Rehabilitation Act claims are dismissed.

*Section 1983 Claims*

Before addressing the contentions of the parties, the Court notes that the Amended Complaint states that each and all Defendants are sued in their individual and official capacities. (Am. Compl. ¶ 12.) They also state that the action is brought against Turner and Winchowky in their official capacities. (*See* Am. Compl. ¶¶ 8, 10).

38

The allegation regarding individual and official capacities is not applicable to the Town or the Village. *Estate of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (outlining the basis under which municipalities may be liable under § 1983).

Furthermore, *Kentucky v. Graham*, 473 U.S. 159, 165 n.10 (1985) explains, in the context of § 1983 actions, the nature of individual capacity, also referred to as personal capacity, lawsuits:

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity.

*Id.* at 165-66. Given the arguable inconsistency regarding the capacities in which Turner and Winchowsky are named, the Court has proceeded on the basis that Turner and Winchowsky are being sued in their individual and official capacities. Having addressed these preliminary issues, the Court will address the parties' arguments with respect to summary judgment on the Plaintiffs' § 1983 claims.

*Section 1983 Excessive Force Claims Against Czarnecki and Nelson*

The Town Defendants assert that Czarnecki's actions on July 9, 2006, do not constitute excessive force as a matter of law. The Village Defendants also contend that the excessive force claim against Nelson should be dismissed.

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The two key elements establishing a violation of § 1983 are (1) a deprivation of a federally guaranteed right, (2) perpetrated under color of state law. *McCoy v. Harrison*, 341 F.3d 600, 605 (7th Cir. 2003); *Soldal v. Cook County, Ill.*, 506 U.S. 56, 60 n.6 (1992) (citation omitted).

The Fourth Amendment, guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures" of the person. "*[A]ll* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989).

The standard for an excessive force claim under the Fourth Amendment is one of "objective reasonableness." *Id*. at 397. What constitutes "reasonableness" when using force while apprehending a suspect is "'not capable of precise definition or mechanical application' but 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Abdullahi*, 423 F.3d at 768 (quoting *Graham*, 490 U.S.

at 396). Mental illness may also be relevant to the reasonableness inquiry. *Abdullahi*, 423 F.3d at 770. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham*, 490 U.S. at 396.

With respect to a claim of excessive force, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. *Id.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Instead, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. In this action, many of the material facts are undisputed, therefore, the reasonableness of the force is a legal issue. *See Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003).

Viewed in the light most favorable to the Plaintiffs, the evidence in this case establishes that Cyrus was reported missing by his parents and known by both officers to be mentally-ill. There was no information that Cyrus was armed and there was no indication that Cyrus might have been armed. Cyrus was wearing only a robe and had been gone from his home all night.

When Czarnecki responded to the dispatch, he knew that there was an individual who was present on Williams's property who was not acting normal. Based on Williams's call he also had probable cause to arrest Cyrus for criminal trespass to dwellings in violation of

41

Wis. Stat. § 943.14,[20] or for entry onto a construction site or into a locked building, dwelling or room of another in violation of Wis. Stat. § 943.15(1); both of which are class A misdemeanors.[21]

Czarnecki approached Cyrus, recognized him from their prior encounters, and spoke calmly to him. After Czarnecki told Cyrus that he had been called to the scene because someone was on the wrong property, Cyrus responded that Czarnecki was on private property and needed to leave. Cyrus also turned his back to Czarnecki and was running back into the house. Once Cyrus fled, Czarnecki also had probable cause to believe that Cyrus was violating Wis. Stat. § 946.41(1), Stats., which provides that one who knowingly resists or obstructs an officer acting in an official capacity is guilty of a Class A misdemeanor. Resisting or obstructing under this section includes fleeing a lawful attempt to detain. *See State v. Grobstick*, 546 N.W.2d 187, 189-90 (Wis. Ct. App. 1996).

At that point, Czarnecki knew that he was not going to be able to persuade Cyrus to leave the premises. Czarnecki was the only officer on the scene. Williams was present and Czarnecki did not know if there were other individuals inside the home who might be endangered if Cyrus reentered the house. It was also safer for Czarnecki to take Cyrus into custody in the outdoors.

_____

[20]The Town Defendants also assert probable cause existed to arrest Cyrus for burglary. However, the record does not indicate that Cyrus had intent to steal or to commit a felony. *See* Wis. Stat. § 943.10.
    The Defendants do not argue that they could have taken Cyrus into custody for emergency detention under Wis. Stat. § 51.15.

[21]The penalty for class A misdemeanors is a fine not to exceed $10,000 or imprisonment not to exceed nine months, or both. *See* Wis. Stat. § 939.51(3)(a).

In considering the force used, the Court notes that tasers are generally considered a form of non-lethal force. *See Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1168 (E.D. Cal. 2008) (collecting cases including *Ewolski v. City of Brunswick*, 287 F.3d 492, 508 (6th Cir. 2002); *Matta-Ballesteros v. Henman*, 896 F.2d 255, 256 n.2 (7th Cir. 1990); *Montgomery v. Morgan County*, 1:06-CV-0915-RLY-TAB, 2008 WL 596068, *11 (S.D. Ind. Feb. 29, 2008)). *See also, San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 969 n.8 (9th Cir. 2005); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004).

The Court of Appeals for this Circuit has described a taser as "a non-lethal device commonly used to subdue individuals resisting arrest. It sends an electric pulse through the body of the victim causing immobilization, disorientation, loss of balance, and weakness. It leaves few, if any, marks on the body of the victim." *Matta-Ballesteros*, 896 F.2d at 256 n.2. Another court has explained that a taser "works by causing involuntary muscle contractions, similar to muscle cramps, that preclude the suspect from engaging in the type of coordinated motion necessary to fight or flee." *McDonald v. Pon*, No. C05-1832-JLR, 2007 WL 4420936, *2-*3 (W.D. Wash. Dec. 14, 2007). Further, one court has noted that while pain is a necessary byproduct of the taser, pain is not the primary motivator. *See Beaver v. City of Federal Way*, 507 F. Supp. 2d 1137, 1142-43 (W.D. Wash. 2007), *aff'd*, 301 Fed. Appx. 704 (9th Cir. 2008). The taser is considered to inflict considerably less pain than other forms of force, and the effects of the taser are generally temporary. *Id.*

Case 2:07-cv-01035-RTR   Filed 04/24/09   Page 43 of 56   Document 67

The Court will view the use of a taser as an intermediate or medium, though not insignificant, quantum of force that causes temporary pain and immobilization. *See Matta-Ballesteros*, 896 F.2d at 256 n.2; *Beaver*, 507 F. Supp. 2d at 1142-43; *McDonald*, 2007 WL 4420936 at *2-*3. *See also*, *Draper*, 369 F.3d at 1278. Furthermore, despite viewing the evidence in the light most favorable to the Plaintiffs, the Court concludes that under the facts and circumstances presented, Czarnecki's initial use of the TASER was objectively reasonable.

With respect to the second time the TASER was deployed, the record establishes that, while waiting for backup, Cyrus was on the ground and Czarnecki instructed Cyrus to show his hands and put them behind his back. Cyrus did not comply. Viewing the evidence in the light most favorable to the Plaintiffs, the Court further considers that Cyrus was barrel-rolling prior to Nelson's arrival,[22] and that Czarnecki used the TASER, the second time, shortly after Nelson arrived.

In considering the second use of the TASER, the Court notes that the Plaintiffs' focus is on the number of times that Czarnecki deployed the TASER against Cyrus, not the mode of TASER operation employed. Therefore, it is not clear which mode of operation should be considered when construing the evidence in the light most favorable to the Plaintiffs, or whether the Plaintiffs' position is that it does not make a difference in the excessive force analysis.

---

[22]See Plaintiffs' Response to paragraph 55 of the Town Defendants' Proposed Findings of Fact..

Regardless, although two officers were now on the scene, the second use of the TASER was objectively reasonable since Cyrus was barrel-rolling and they had not gained control of Cyrus in order to handcuff him.

Considering the evidence in the light most favorable to the Plaintiffs, the TASER was activated four more times in the drive-stun mode at intervals lasting five seconds. The next "phase" of the TASER use is difficult to divide into discrete incidents of TASER use because the evidence does not define them. The four additional activations occurred over a period of about 60 seconds, but the evidence does not disclose the exact timing of the fourth and fifth deployments. During those 60 seconds, Cyrus was prone, and Czarnecki and Nelson were on opposite sides of his upper body. With the goal of placing Cyrus in handcuffs, Nelson was trying to free Cyrus's hands from under Cyrus's body. Czarnecki was also trying to extricate Cyrus's hands from beneath Cyrus's body.

At the same time, the officers continued to command Cyrus to quit resisting and to provide his hands for handcuffing. Cyrus did not comply. Czarnecki continued to warn Cyrus that he would deploy the TASER again if Cyrus did not comply. Nelson was initially on the right side of Cyrus's body. After Nelson succeeded in placing Cyrus's right hand in the handcuffs, he switched his position so that he was on the left side of Cyrus's body. Cyrus persisted in continuously struggling for the entire minute it took the officers to place him in restraints.

Cyrus was facing down as he struggled. Czarnecki continued to warn Cyrus that he would use the TASER again. Nelson was attempting to pull Cyrus's left hand out from

under him, but Cyrus resisted.  Neither officer put their weight on Cyrus while they were trying to restrain him. Cyrus had no right to resist the officers' attempts to arrest him.  *See Henning v. O'Leary*, 477 F.3d 492, 495 (7th Cir. 2007)  (citing *State v. Hobson*, 577 N.W.2d 825, 837 (Wis. 1998)).

The 60-second period during which Czarnecki tased Cyrus four times presented the officers with an extremely challenging situation.  While the officers could reasonably believe that Cyrus was experiencing an exacerbation of his mental illness,  Cyrus was not responding to their lawful commands and he was actively resisting arrest.  Czarnecki was also warning Cyrus that he would again use the TASER.  The officers needed to obtain control of Cyrus and the situation for the safety of all concerned.  This was a difficult situation that was concluded by bringing distress to all the parties involved and particularly deep sadness to Plaintiffs Chet and Brenda Cyrus, but the Court must conclude, applying the existing standards of law, that Czarnecki did not use excessive force when he deployed his ECD the four additional times in the drive-stun mode as the officers attempted to obtain control over Cyrus.

While the Plaintiffs cite two excessive force decisions contending that officers may not use force when a suspect is not a threat despite the fact that the suspect may not be complying with the officer's commands, *Smith v. City of Hemet*, 394 F.3d 689, 703(9th Cir. 2005), and *DeSalvo v. City of Collinsville, Ill*, No. 04-CV-0718-MJR, 2005 WL 2487829 *4-*5 (S.D. Ill. Oct. 7, 2005).  Neither decision is analogous.

*Smith* involved an appeal from a district court decision granting summary judgment dismissing a § 1983 action on the ground it was barred by *Heck v. Humphrey*, 512

46

U.S. 477 (1994), because the lawsuit called into question Smith's conviction for resisting, delaying or obstructing an officer. 394 F.3d at 693. The court of appeals reversed that determination. *Id*. The appellate court rejected the defendants' request to affirm summary judgment on the alternative ground that the use of force was reasonable. *Id*. at 700-04. The court found that there was a material factual dispute about when a police canine – Quando – initially attacked Smith, and that Smith had presented a reasonable amount of evidence upon which a jury could find the force used against Smith was excessive.

*Smith* involved a domestic abuse call from the suspect's wife who informed emergency personnel that Smith did not have a gun, no weapons were in the house, and he was wearing his pajamas. 394 F.3d at 693. When the first officer, Reinbolt, arrived to investigate the incident, Smith was standing on the front porch with his hands in his pockets. *Id.* The officer announced his presence and instructed Smith to remove his hands from his pockets. *Id*. Smith refused, responding only with verbal abuse and directing the officer to approach him. *Id*. Smith refused a second directive to remove his hands from his pockets, and instead reentered his home. *Id*.

After the officer advised the dispatcher of what had transpired, Smith re-appeared on the porch with his hands still in his pockets. *Id*. Again, the officer told Smith to remove his hands from his pockets, Smith complied but refused the officer's order to place his hands on his head and walk toward the officer. *Id*. Instead, Smith told the officer to approach him and enter his home with him. *Id*. At Reinbolt's request for assistance, a second officer arrived at the scene. *Id*. Observing Smith's failure to cooperate, the second officer called for

47

additional assistance, including a canine unit. *Id*. The canine unit, including the canine handler, Quinn, and an additional responding officer arrived at Smith's residence. *Id*.

Quinn directed Smith to place his hands on his head – Smith refused despite being informed that Quando might bite. *Id*. at 694. Without further warning, Quinn sprayed Smith in the face with pepper spray. *Id*. Smith responded with expletives and attempted to reenter his home, but the door had been locked by his wife. *Id*. Several more officers moved onto the porch, grabbed Smith from behind, slammed him against the door and threw him down on the porch. *Id*. Quinn ordered the Quando to attack Smith. *Id*. Quando bit Smith on his right shoulder and neck area. *Id*. At some point, either before or after the attack order, Quando sank his teeth into Smith's arm and clung to it. *Id*. With at least four officers surrounding him and Quando's teeth sunk into his shoulder and neck, Smith agreed to comply with the officers' orders and submit to arrest. *Id*. Smith was curled up in a fetal position with one of his hands not in the officers' view. *Id*.

As an officer was attempting to secure Smith's arms, Quinn instructed Quando to bite Smith a second time. *Id*. Quando bit Smith on his left side and shoulder blade. *Id*. After Quando retreated, the officers dragged Smith of the porch, face down. *Id*. Smith continued to shield one of his arms from the dog's attack. *Id*. Quinn ordered Quando to bite Smith a third time – Quando bit Smith's buttocks. *Id*. While this was transpiring, Smith was pepper-sprayed at least four times. *Id*. At least two of the sprayings occurred after Quando had seized Smith and broken his skin, and at least one after the officers had pinned Smith to the ground. *Id*. Eventually, the officers placed Smith in handcuffs. *Id*. Reinbolt washed the

pepper spray from Smith's eyes with water from a nearby hose, but did not cleanse Smith's dog bite wounds. *Id*. Paramedics arrived shortly thereafter and attended to Smith's injuries. *Id*.

Applying the *Graham* factors, the court of appeals considered the quantum of force used to arrest Smith. *Id*. at 701. It noted the force used against Smith was "severe." *Id*. The officers had used two forms of intermediate force: pepper spray; and, the police canine. *Id.* The court of appeals relied on Smith's version that officers slammed him against the wall, slid him off the porch face down, pepper-sprayed him repeatedly, and either permitted or instructed Quando to attack him on three occasions, with at least one attack while the officers had him pinned to the ground. *Id.* The canine assault punctured skin on various parts of Smith's body, and the effects of the pepper spray was exacerbated by the unwashed dog bite wounds that Reinbolt did not flush out. The court also found that a jury could reasonably find that Smith did not pose a threat to the officers or the safety of others at any time. *Id.* It also concluded that the nature of the crime provided little, if any, basis for the use of physical force. *Id.* Finally, the court found that Smith's resistence was not particularly bellicose, and to the extent that Smith resisted arrest it lasted for only a brief time, and that he did not show any signs of fleeing. *Id.*

There are significant differences between this case and *Smith*, with respect to the force used and the number of officers involved. This case involved one type of intermediate force, the TASER. In *Smith*, two types of intermediate force were used. The two types of

49

intermediate force also had a multiplication effect; that is, the pepper spray was more disabling and painful because it entered the dog bite wounds.

Unlike *Smith*, Cyrus attempted to flee, resulting in potential risk to others. At the time of the initial TASER deployment, Czarnecki was the only officer present. Czarnecki did not know whether anyone was inside the Williams home.

Unlike *Smith*, Cyrus actively resisted arrest throughout the encounter. There is no evidence that Cyrus told the officers that he would comply with their directive or that he submitted to the officers' attempts to arrest him.

Unlike *Smith*, Cyrus was not thrown against a wall or dragged down steps face down. The officers in *Smith* were also not presented with a suspect who was known to be mentally-ill and experiencing an exacerbation of that illness.

The other decision relied upon by the Plaintiffs is the *DeSalvo* case from the Southern District of Illinois. *DeSalvo*, No. 04-CV-0718-MJR, 2005 WL 2487829 at *4-*5. The court denied the defendants' summary judgment motion holding that it was not convinced that no reasonable jury could conclude that Krug, the officer involved, used excessive force against DeSalvo. *Id*. at *5. The court noted that, according to DeSalvo, he was arrested for asking Krug, as a crowd was disbursing, why he was arresting an older man for not immediately complying with Krug's order to disburse from the crowd-filled parking lot. *Id*. Krug responded by bending DeSalvo's arm behind his back, pushing DeSalvo into the squad car chest first, and handcuffing him. *Id*.

Further, when DeSalvo objected to being arrested, Krug tased DeSalvo's neck with little, if any, warning. *Id*. As DeSalvo turned toward the car, Krug threatened to tase DeSalvo again if he did not enter the squad car. *Id*. at *2. Krug activated the taser again near or against DeSalvo's forehead before DeSalvo entered the squad car. *Id*. Four other squad cars were present at the scene, two other officers were standing next to DeSalvo and Krug, and two more officers were within 20 feet of them. *Id*. Before being tased, DeSalvo stood motionless at the door of the squad car, showing no signs of aggression or physical resistence. *Id*.

*DeSalvo* does not present circumstances that are comparable to those presented in this action. DeSalvo involved an officer's application of two episodes of intermediate force to an alleged minimal obstructing offense. In addition, DeSalvo's verbal objection to the arrest was minimal, and DeSalvo offered no physical resistance to the arrest nor did he attempt to flee. There were five officers at the scene. Cyrus's conduct was clearly unlike DeSalvo's. The facts and circumstances presented to Czarnecki and Nelson are unlike those of *DeSalvo*.

In considering Nelson's motion for summary judgment, the Court notes that he did not deploy the TASER against Cyrus. However, an officer who is present and fails to intervene to prevent other law enforcement officers from infringing on constitutional rights of citizens is liable under § 1983 "if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282,

285 (7th Cir. 1994) (citing *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994)).  In this case, the Court has determined that Czarnecki did not use excessive force.  Nelson cannot be found liable for failing to intervene to prevent a constitutional violation that the Plaintiffs have not established. Moreover, even if it was determined that Czarnecki used excessive force by the repeated use of the TASER in the drive-stun mode, there is insufficient evidence  upon which a jury could reasonably find that Nelson was aware of those repeated uses. *See id.*  Thus, the Plaintiffs' § 1983 claims against Czarnecki and Nelson are dismissed.

*Section 1983 Excessive Force Claims Against Winchowsky- Supervisory Liability*

The Village Defendants also seek dismissal of the § 1983 claim against Winchowsky on the ground that he lacked the level of participation to be liable as a supervisory official.  "Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of the persons they supervise." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009).  The Plaintiffs have not presented evidence that Winchowsky was personally involved in the Cyrus incident. *See Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001).  Therefore, the Plaintiffs' claim against Winchowsky in his individual capacity is dismissed.

*Qualified Immunity*

The individual defendants  contend that they are entitled to qualified immunity. The doctrine of qualified immunity shields from liability public officials who perform discretionary duties. *Belcher v. Norton*, 497 F.3d 742, 749 (7th Cir. 2007).  The Supreme Court articulated a two-part test for qualified immunity:  (1) whether the facts, taken in the

light most favorable to the plaintiff, show that the defendants violated a constitutional right; (2) whether that constitutional right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[23] A plaintiff may discharge the burden of showing that the constitutional right was clearly established by showing that there is "a clearly analogous case establishing a right to be free from the specific conduct at issue" or that "the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Smith v. City of Chi.*, 242 F.3d 737, 742 (7th Cir. 2001); *Saffell v. Crews*, 183 F.3d 655, 658 (7th Cir. 1999). Because each of the individual defendants are entitled to summary judgment dismissing the Plaintiffs' federal claims, it is not necessary to address their qualified immunity arguments. *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997).

*Municipal Liability & Failure to Train*

The Plaintiffs' excessive force claim against the Town and the Village, and Turner and Winchowsky, in their role as policymakers, rely upon *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 691 (1978) and *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). However, the government as an entity is responsible "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. *See also*, *Estate of Sims ex rel. Sims*, 506 F.3d at 514. There must be a direct

---

[23] Recently in *Pearson v. Callahan*, __U.S __, 129 S.Ct. 808, 818 (2009), the Supreme Court clarified that the *Saucier* sequence is not an inflexible requirement. *See Akande v. Grounds*, 555 F.3d 586, 590 n.3 (7th Cir. 2009). However, courts are still free to follow that *Saucier* protocol where it facilitates the expeditious disposition of the case. *Id*.

causal link between the alleged unconstitutional deprivation and the municipal policy or custom at issue. *City of Canton*, 489 U.S. at 385. There are limited circumstances when "failure to train" may be a basis for municipal liability under § 1983. *Id.* at 388.

However, a failure to train theory or a failure to institute a municipal policy requires a finding that the individual officers are liable on the underlying substantive claim. *Tesch v. County of Green Lake*, 157 F.3d 465, 477 (7th Cir 1998). Since this Court has found that Czarnecki and Nelson did not inflict a constitutional injury on Cyrus, neither the Town or the Village nor Turner or Winchowsky, can be held liable to the Plaintiffs. *See id.* Therefore, the Town, the Village, Turner, and Winchowsky have no *Monell* liability under Section 1983, and such claims against them are dismissed.

*Supplemental State Claims*

The Plaintiffs also assert state law assault and battery and negligent infliction of emotional distress claims against Czarnecki and Nelson, and a wrongful death claim against all the Defendants.

Generally, when a court resolves all federal claims before trial, it should dismiss supplemental claims without prejudice. *Redwood v. Dobson*, 476 F.3d 462, 467 (7th Cir. 2007). In the exercise of its discretion, this Court declines to exercise jurisdiction over the Plaintiffs' state law claims and they are dismissed without prejudice.

Case 2:07-cv-01035-RTR   Filed 04/24/09   Page 54 of 56   Document 67

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

The Town Defendants' motion to exclude Waller and Biedrzycki's testimony (Docket No. 28) is **GRANTED** to the extent that Waller's first, third, and fourth opinions as set forth in his expert report are excluded and Biedrzycki's testimony about the eight factors involved in Cyrus's death is excluded**;**

The Village Defendants' motion to exclude Waller's testimony (Docket No. 31) as to the fourth opinion in his expert report is **GRANTED;**

The Town Defendants' motion for summary judgment is **GRANTED** (Docket No. 23) to the extent that the Plaintiffs' § 1983, ADA, and Rehabilitation Act claims arising out of Cyrus's July 9, 2006, encounter are **DISMISSED**;

The Village Defendants' motion for summary judgment is **GRANTED** (Docket No. 34) to the extent that the Plaintiffs' § 1983, ADA, and Rehabilitation Act claims against them arising out of Cyrus's July 9, 2006, encounter are **DISMISSED**;

The Plaintiffs' supplemental state law assault and battery and negligent infliction of emotional distress claims against Czarnecki and Nelson, and their wrongful death claim against all the Defendants are **DISMISSED** without prejudice;

This action is **DISMISSED**; and,

The Clerk of Court is **DIRECTED** to enter judgment accordingly

Dated at Milwaukee, Wisconsin this 24th day of April, 2009.

                                    **BY THE COURT**


                                    _s/ Rudolph T. Randa_
                                    **Hon. Rudolph T. Randa**
                                    **Chief Judge**