# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

CHET CYRUS,
BRENDA CYRUS, and
THE ESTATE OF NICKOLOS
WILLIAM CYRUS by BRENDA CYRUS,
Special Administrator,

                Plaintiffs,

v.                                        Case No. 07-C-1035

TOWN OF MUKWONAGO, and
THOMAS CZARNECKI,

                Defendants.

## DECISION AND ORDER

This Court granted summary judgment for the Defendants, Town of Mukwonago (the "Town") and Town law enforcement officer Thomas Czarnecki ("Czarnecki"), in his individual and official capacities. That judgment was reversed and remanded by the Court of Appeals for the Seventh Circuit which concluded that the facts in the record presented a jury question as to whether excessive force in violation of the Fourth Amendment was utilized in the arrest and apprehension and death of Nickolos William Cyrus ("Cyrus") on July 9, 2006. Subsequent to that remand, the Defendants filed a motion for summary judgment based on the doctrine of qualified immunity (ECF No. 89) and the Plaintiffs, Chet Cyrus ("Chet"),[1] Brenda Cyrus ("Brenda"), and the Estate of Cyrus (the "Estate"), by Brenda as the special

---

[1] To distinguish between the three members of the Cyrus family, the Court has departed from its usual practice of referring to individuals by surname. The Court has referred to the deceased by his surname and each parent by given name. No disrespect is intended by the Court's reference devices.

administrator, (collectively the "Plaintiffs"), filed a motion to extend discovery and allow supplementation of the expert reports of Dennis Waller ("Waller") and Lynda Biedrzycki, M.D., ("Biedrzycki"). (ECF No. 88.) Although the Plaintiffs' motion is vague, the Court infers that they seek permission for the two experts to prepare supplemental reports and for a limited reopening of discovery on those supplemental reports. The motions are ready for resolution and are addressed herein.

The Court has subject matter jurisdiction over the Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4). Venue in this District is proper under 28 U.S.C. § 1391(b).

### *Qualified Immunity*

The Defendants maintain that the action should be dismissed in its entirety with costs because the doctrine of qualified immunity protects them from liability since a reasonable officer could have believed that the actions taken by Czarnecki were lawful in light of clearly established law at the time, given the information that he, Czarnecki possessed. In deciding the Defendants' motion, the Court applies the following standards. Qualified immunity may be asserted by a state actor as a defense to personal liability for a claim for money damages brought by a citizen under § 1983. *See Anderson v. Creighton*, 483 U.S. 635, 636-37 (1987). In deciding whether state actor defendants are entitled to qualified immunity, the following two-part test is applied: (1) whether the facts alleged, taken in the light most favorable to the plaintiff, amount to a constitutional violation; and (2) whether the constitutional right at issue was clearly established at the time of the alleged violation. *Jones v. Clark*, 630 F.3d 677, 680 (7th Cir. 2011). The two parts of this test may be addressed by

courts in any order. *Pearson v Callahan*, 555 U.S. 223, 236-42 (2009). Here, the Court of Appeals for the Seventh Circuit previously determined that a material issue of fact exists as to how much force was used on Cyrus. *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862-63 (7th Cir. 2010). Thus, the Defendants focus on the second part of the qualified immunity test.

A constitutional right is considered "clearly established" if the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . In the light of preexisting law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640. Furthermore, although the Fourth Amendment is clearly violated by the use of excessive force, qualified immunity requires a more specific, fact-intensive analysis since it protects state actors in those situations where the law is not sufficiently clear for a reasonable official to have known that his conduct was unlawful. *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (citing *Anderson*, 483 U.S. at 640); *Phelan v. Vill. of Lyons*, 531 F.3d 484, 488 (7th Cir. 2008). Indeed, "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202.

*Relevant Facts*[2]

In considering the Defendants' assertion of qualified immunity, the Court will restate the facts which include the supplemental facts added since this Court's previous ruling. At the time of his death, Cyrus was a 29-year-old male who had previously been diagnosed with mental illness and lived at home with his parents. Cyrus's treating physician, Dr. Basil

---

[2]The relevant facts are based upon the Defendants' statement of the undisputed factual record as augmented by additional facts proffered by the Plaintiffs to the extent they are undisputed for purposes of summary judgment. Citations to all quoted excerpts, including undisputed facts, are provided.

Jackson, diagnosed the mental illness as bipolar disorder, but found that Cyrus's symptoms had some similarities to schizophrenia. Cyrus was treated with Zyprexa, an anti-psychotic drug. Regardless of the treatment, Cyrus had prior exacerbations of his illness in the years prior to his death that resulted in police interventions. In connection with these interventions, Czarnecki had prior contact and involvement with Cyrus without incident or complaint.

Czarnecki has been a certified police officer since 1995 and was a sergeant on July 9, 2006. In addition to other training and certifications, Czarnecki completed training to become certified in the use of a Taser® electronic control device (hereinafter "ECD") by attending a required course taught by one of the Town officers, Officer Craig Ketola ("Ketola"). Czarnecki completed the course on June 6, 2006, and was thereafter certified to carry and use an ECD as a law enforcement officer. The Town maintained a written policy regarding the use of force and the appropriate use of an ECD. At the time of the incident subject to this lawsuit, Czarnecki was carrying a TASER® X26 ECD.

The X26 ECD, like most ECDs, has two methods of operation. In the first method, "probe" mode, the ECD can be deployed through a trigger pull leading to the launch of two probes from a cartridge. When the probes each make contact with the body, a circuit is completed between the probes, which leads to an electrical current passing over the surface of the body between the two probes. The current will continue to pass between the probes for as long as the trigger is pulled or up to five seconds, whichever is longer. However, each probe is connected by a wire and should the wire connecting each of the two probes break or should one of the probes become disengaged from the body, the ECD will no longer function through the use of a trigger-pull. The purpose of such a deployment through the probes is to

cause slight muscle contraction resulting in temporary incapacitation and pain in order to gain compliance.

The second method, the "drive-stun" mode, the ECD can be deployed, in close range to the subject, by pressing the ECD against the subject's body and pulling the trigger. The ECD itself creates a circuit within the framework of the device which is approximately one and one-half inches wide. The "drive-stun" mode is used exclusively for pain compliance since it affects such a small area of the body. Again, the use of the ECD in the "drive-stun" mode is limited to a maximum of a five-second deployment for each trigger pull.

The X26 ECD used in this case contains a computer-based memory that records a date and time for every trigger pull. Importantly, the recording only memorializes the fact that the trigger on the device was pulled.

On July 8, 2006, Cyrus was experiencing an exacerbation of his underlying psychiatric condition and was found by the Rock County Sheriff's Department wandering along the side of the interstate in a delusional state. Cyrus was taken to the Rock County Mental Health facility, where a decision was made to release Cyrus back into the custody of his parents. It is important to recognize that the Rock County Sheriff's Department, which had no prior contact history with Cyrus, was able to gain his compliance without incident, without the use of any force which would include the use of an ECD.

Once in the custody of his parents and back home in Mukwonago, Wisconsin, Cyrus continued to suffer from an exacerbation of his mental illness. While at home, Cyrus removed his clothing, except for a bathrobe, and ran away during the evening hours on July 8, 2006.

After Cyrus ran away from home, his parents contacted the Village of Mukwonago ("Village") Police Department, which then began a search for Cyrus. When Brenda contacted the police department, she indicated that she wanted Cyrus taken into custody so he could be hospitalized and receive additional treatment. She did not want him returned to the home until he had additional medical care.

Throughout the night, officers were not able to locate Cyrus. Then, at approximately 7:45 a.m. on July 9, 2006, Village dispatchers received a call from a homeowner, Bradford Williams ("Williams"), indicating that there was a man in his home who was not acting in a normal manner. The dispatcher directed Czarnecki, from the Town police department, to the Williams home.

At the time of the dispatch, Czarnecki suspected the man in the house was Cyrus. While en route, Czarnecki was told that Cyrus was in the Williams home, but that he had been going back and forth between the inside of the home and the garbage dumpster located outside of the home. Importantly, when Czarnecki arrived at the scene, he was not aware of whether anyone was in the home.

Once at the home, Czarnecki was able to positively identify Cyrus as the intruder based on his prior contact with Cyrus. Additionally, when Czarnecki arrived at the scene, he was aware that Cyrus had been missing for several hours. After getting out of his squad car, Czarnecki noticed Williams at the end of his driveway and also saw Cyrus on the Williams' property closer to the front door of the home.

Czarnecki immediately identified himself to Cyrus, took an open stance and asked Cyrus to step away from the home and come towards the road to talk to him. Czarnecki also described his own stance as bladed.[3]

Williams described Czarnecki's initial interaction with Cyrus as follows:

Q: So would it be fair to say then that Officer Czarnecki was not yelling? If he was yelling, would you have been able to hea[r]?

A: Yes. No, he was very calm. And I could tell from what – because he didn't have his back to me. They were kind of on the side, so I could see that he was trying to calm Cyrus down, because he was walking in circles… It appeared to be that [Cyrus] was being belligerent and that – I don't even know this officer's name, but he was very calm. And I could tell that he was giving some kind of command to settle down or to come with him or whatever it was.

(Hall Aff. Ex. G at 24-25; Defs.' PFOF 43; Pls.' Resp. PFOF 43.) After the foregoing initial exchange, Czarnecki asked Cyrus to identify himself and asked if he belonged on the property. In response, Cyrus indicated that he lived at the property and insisted that his brother lived next door. From his past experience, Czarnecki knew that Cyrus's statements were not accurate.

Czarnecki then told Cyrus that he had been dispatched to the scene because someone was on the wrong property. Cyrus, barefoot and naked from the waist down, responded by stating that Czarnecki was on private property and needed to leave. During this initial discussion, Czarnecki was gesturing in a way to invite Cyrus to walk away from the house and to come talk with him.

---

[3]The Defendants indicate that the following additional fact is needed to provide context - "Czarnecki also had removed his ECD from its holster shortly after exiting the squad car and before Cyrus ever made any move to return to the house." (citing Gatzke Aff. Ex. D 129-30.) The Plaintiffs state that the cited materials are silent as to the timing of Czarnecki's unholstering of the ECD relative to exiting his vehicle or Cyrus's moving to return to the house. The cited materials do not directly support the proffered statement. Therefore, it has not been included.

After this exchange, Cyrus turned around and walked away from Czarnecki and toward the house.[4] As a result, Czarnecki then deployed his ECD in "probe" mode, hitting Cyrus in the back. Upon deployment of the ECD, Cyrus fell to the ground.

When questioned about why he deployed the ECD when he did, Czarnecki indicated that he viewed Cyrus's turning away from him and approaching the house as "potentially dangerous." (Hall Aff. Ex. E at 60; Defs.' PFOF 49; Pls.' Resp. PFOF 49.) Czarnecki also responded "[t]hat [Cyrus] was not obeying commands or questions being answered [sic]." (Gatzke Aff. Ex. B at 49, 9-10.) More specifically, Czarnecki testified that he deployed the ECD because he knew that, prior to his arrival at the scene, Cyrus had been going back and forth between the house and a dumpster outside and he had concerns that Cyrus may have been obtaining a weapon or something that could be used as a weapon. Czarnecki testified that he was also aware that there already had been a confrontation between Williams and Cyrus. Further, Czarnecki was unaware of whether there was anyone else home who might be in danger if Cyrus went back into the house.

From a tactical perspective, Czarnecki believed it was much safer for an officer to take someone into custody outdoors as compared to entering an unfamiliar home. The foregoing rationale and the fact that Cyrus did not comply with his previous requests, are what Czarnecki based his decision on when initially deploying the ECD.

When Czarnecki deployed the ECD for the first time, he was aware of the fact that he had backup on the way from the Village police department. Prior to taking further action to bring Cyrus into custody, Czarnecki decided to wait for backup. While waiting for

---

[4] Whether Cyrus walked toward the house or ran toward the house is disputed. However, the Court has construed the facts in the light most favorable to the Plaintiffs.

his backup, Czarnecki stood approximately ten feet away from Cyrus, who was laying on the ground, and ordered Cyrus to show his hands and put them behind his back. Cyrus did not comply with Czarnecki's commands.

Within a short period of time, Eric Nelson ("Nelson") from the Village police department arrived at the Williams house. Cyrus was still not complying with the officers' commands. The ECD was deployed a second time by Czarnecki before Cyrus began to "barrel-roll." According to the Plaintiffs, Cyrus began to "barrel-roll" *before* Nelson arrived at the scene (Pls.' Resp. PFOF 55), which is supported by the testimony of both Williams and Czarnecki.[5] The Plaintiffs assert that Cyrus was unable to comply with the officers' commands.

After Cyrus completed the "barrel-roll," the officers attempted to handcuff Cyrus by gaining control of his hands, which he was holding under his body. Once Cyrus stopped his "barrel-roll," Czarnecki pulled the trigger on the ECD another time; however, he does not recall whether the ECD was effective or whether the wire between the probes had been broken by the "barrel-roll."

The officers continued to give commands to Cyrus demanding that he quit resisting and that he provide his hands for handcuffing. Initially, Czarnecki was on Cyrus's left side and Nelson on the right. Czarnecki continued to warn Cyrus throughout the entire incident that he would deploy the ECD again if Cyrus did not comply. Again, Cyrus did not comply with the commands.

---

[5]The Defendants rely on Nelson's testimony that he may have been present for the "barrel-roll" and that Czarnecki may have activated the ECD in response to Cyrus's noncompliance with commands at the moment of the "barrel-roll."

Unable to pull Cyrus's arms from under him and get his hands for handcuffing, Czarnecki deployed the ECD in "drive-stun" mode to Cyrus's back. Throughout the entire struggle which, according to Williams, lasted about one minute, Cyrus never complied with the officers' commands. As a result, Czarnecki deployed the ECD in "drive-stun" mode multiple times in unison with Nelson's attempts to pull Cyrus's arms from under him.

As a result of the combined effect of the "drive-stun" ECD deployments and Nelson's physical efforts, Nelson was able to get Cyrus's right arm out from under him and handcuffed. After Cyrus's right arm was handcuffed, Czarnecki and Nelson switched sides so that Nelson could handcuff Cyrus's left hand. Throughout the entire incident, the officers continued to give Cyrus commands to provide his hands for handcuffing, however, Cyrus never produced his hands.

During the handcuffing process, Nelson believed Cyrus was actively resisting apprehension. Specifically, Nelson testified that "[Cyrus] didn't willingly show his hands nor when I tried to remove his hands from underneath him did he allow me to . . . In my opinion it was active resistance to apprehension." (Hall Aff. Ex. F at 24; Defs.' PFOF 72; Pls.' Resp. PFOF 72.)

After Cyrus was handcuffed, Czarnecki took the precaution of calling for an ambulance. However, after the officers rolled Cyrus over onto his back and noticed he was not breathing, Czarnecki immediately radioed for the ambulance to "step it up." (Hall Aff. Ex. E at 78; Defs.' PFOF 79; Pls.' Resp. PFOF 79.) Cyrus never regained consciousness and was pronounced dead at the hospital.

For purposes of this motion, the exact number of times the ECD was deployed with a verified contact to Cyrus is six. Nelson's testimony suggests that the ECD was deployed twice through the "probe" mode and four times through the "drive-stun" mode. Biedrzycki, the Plaintiffs' sole medical expert, who also conducted the autopsy, concluded that the ECD contacted Cyrus a total of six times. The TASER® X26 ECD recorded a total of twelve trigger pulls during the relevant time period; however, this may include times in which the trigger was pulled during the "barrel roll" and other struggles but the ECD made no contact with Cyrus.

*Analysis*

The Defendants contend that, while there is a material dispute as to the precise number of times that the ECD was deployed, any such dispute is immaterial because it remains undisputed that Cyrus continuously resisted arrest and failed to follow the officers' commands. The Plaintiffs assert that simply because there is no case which states that being tasered multiple times is an excessive use of force does not mean that the Defendants can rely on qualified immunity.

The Plaintiffs bear the burden of showing that the constitutional right was "clearly established" and must meet this burden by presenting case law that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand. *Anderson*, 483 U.S. at 639-40; *Forman v. Richmond Police Dep't*, 104 F.3d 950, 957-58 (7th Cir. 1997). Additionally, not only must the Plaintiffs show that the right was "clearly established," but that it was "clearly established" on the July 9, 2006, date of the incident at issue. *Rice v. Burks*, 999 F.2d 1172, 1174 (7th Cir. 1993).

While it is "clearly established" that the use of excessive force violates the Fourth Amendment, *Graham v. Connor*, 490 U.S. 386 (1989), the Plaintiffs point to no case law addressing the use of an ECD multiple times on a noncompliant arrestee, or any case law that established the specific right as of July 9, 2006. The Plaintiffs also concede there is no analogous case law addressing the use of an ECD in the particular circumstances presented here. (Pls.' Br. Resp. 14.)

In contrast, the Defendants rely on *Bryan v. MacPherson*, 630 F.3d 805, 833 (9th Cir. 2010), which allowed the defense of qualified immunity in a case concerning the use of ECDs as a result of the "dearth of prior authority" on the issue noting that, as of the July 24, 2005, date of the incident, there was no Supreme Court decision or decision of the Court of Appeals for the Ninth Circuit addressing whether the use of a taser in dart mode constituted an intermediate level of force. However, at the same time, the court found that "[a] reasonable officer in these circumstances would have known that it was unreasonable to deploy intermediate force." *Id.*

The Defendants also rely on *Mattos v. Agarano*, 661 F.3d 433, 446-48 (9th Cir. 2011) *cert. denied,* U.S. , 132 S.Ct. 2682 (2012), noting that as of the November 2004 date the taser was used on the plaintiff, only three relevant opinions from several sister circuit courts of appeal addressed the use of a taser as constituting excessive force, none of which found a Fourth Amendment violation, and therefore, "the law was not sufficiently clear at the time of the incident to render the alleged violation clearly established."

The Defendants also point out that "[t]he Taser is a relatively new implement of force, and case law related to the Taser is developing," citing *Brown v. City of Golden Valley*,

574 F.3d 491, 498 n.5 (8th Cir. 2009). Nonetheless, *Brown* affirmed the denial of summary judgment on qualified immunity grounds in a case involving the October 2005, use of an ECD. The court held at the time the officer deployed his ECD and arrested the suspect, "the law was sufficiently clear to inform a reasonable officer that it was unlawful to apply an ECD to a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator." *Id.* at 499. To support its holding the court also relied on its prior decisions in the Eighth Amendment context involving stun guns and pepper spray and did not focus solely on the device used to deliver the force. *Id.* at 499-500.

> The Supreme Court has provided guidance on the issue:
>
> [T]here is no doubt that *Graham v. Connor* . . . clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet that is not enough. Rather, we emphasized in *Anderson* "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." 483 U.S. [635,] 640 [(1987)]. *The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.*

*Saucier*, 533 U.S. at 201-02. (Emphasis added.) The Supreme Court "does not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, ___ U.S. ___, 131 S.Ct. 2074, 2083 (2011).

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002), held that state actors "can still be on notice that their conduct violates established law even in novel factual circumstances." In *Hope*, the plaintiff was "treated in a way antithetical to human dignity" by being hitched to a post shirtless in extreme heat for many hours in a way that cut his wrists anytime he attempted to adjust himself. *Id*. at 745. Thus, the Supreme Court held that the "fair and clear warning" provided by clearly established law was sufficient to preclude the defense of qualified immunity at the summary judgment stage. *Id*. at 746.

> This Court has the benefit of the appellate *Cyrus* decision that held:
>
> when material facts are in dispute, then the case must go to a jury, whether the argument is that the police acted unreasonably because they lacked probable cause, or they acted unreasonably because they responded overzealously and with too little concern for safety. And we have recognized that summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations. This principle is particularly relevant where, as here, the one against whom force was used has died, because the witness most likely to contradict the officer's testimony - the victim - cannot testify.

*Cyrus*, 624 F.3d at 862.

The Defendants premise their motion on the assertion that it remains undisputed that Cyrus continuously resisted arrest and failed to follow the officers' commands. However, the Court of Appeals found in reversing this Court that "[t]he evidence is also conflicting on the extent to which Cyrus resisted arrest." *Id*. The court also stated that "[t]o be sure there is evidence that Cyrus did not obey Czarnecki's commands. But his behavior is susceptible of different interpretations." *Id*.

This Court also has the benefit of the recent Seventh Circuit Court of Appeals opinion in *Phillips v. Community Insurance Corp.*, 678 F.3d 513, 528 (7th Cir. 2012), that reiterated the standard that "[t]here is no need that the very action in question [have] previously been held unlawful." (quoting *Safford Unified Sch. Dist. v. Redding*, 557 U.S. 364, 377 (2009)).

In this case, the Court of Appeals emphasized that conflicting evidence about how much force was used was a disputed material fact that precluded summary judgment "because the amount of force used bears directly on whether that force was a reasonable response to the situation faced by the officer." *Cyrus,* 624 F.3d at 862. The Court of Appeals also stated that, as the situation progressed over the estimated one-minute period of the encounter, the reasonableness of the use of force may have changed and depending on how the jury interprets the facts it may conclude that the force used was excessive. *See id.* at 863. The jury could reasonably interpret the disputed facts as indicating that at some time during the continuum of the event on July 9, 2006, the use of the ECD on Cyrus clearly violated Cyrus's established Fourth Amendment right to be free from the use of excessive force during his arrest. It may also find the contrary. *See Lewis v. Downey*, 581 F.3d 467, 479 (7th Cir. 2009); *Brown*, 574 F.3d at 499. This unsettled record also impacts this Court's ruling on the Defendants' request for relief under the qualified immunity doctrine. In short, the state of flux that exists with the facts prevents the Court from concluding that the Defendants have established that Czarnecki is entitled to qualified immunity. Consequently, the Defendants'

motion must be denied with respect to the Plaintiffs' Fourth Amendment excessive force claim and Czarnecki's defense of qualified immunity.[6]

The Defendants also argue in their briefs in support of summary judgment and in reply that the Plaintiffs' remaining claims against them, including their state law claims should be dismissed. Previously, the Court declined to exercise supplemental jurisdiction over the Plaintiffs' state law claims and dismissed them. *See Cyrus v. Town of Mukwonago*, No. 07-C-1035, 2009 WL 1110413, at *27 (E.D. Wis. Apr. 24, 2009). The only claims that the Plaintiffs appealed to the Court of Appeals for the Seventh Circuit were the Fourth Amendment excessive force claims. Accordingly, because this Court previously dismissed the state law claims and the Plaintiffs did not appeal that decision, those state law claims are no longer pending and will not be addressed.[7]

As to the Town, the Plaintiffs have not responded to its request for dismissal of their federal claim Fourth Amendment claim against it. Therefore, that claim is dismissed. *See Williams v. REP Corp.,* 302 F.3d 660, 667 (7th Cir. 2002).

## Other Matters

Citing Rule 37(a) of the Federal Rules of Civil Procedure and *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996), the Plaintiffs seek permission to supplement

---

[6] Procedurally the Defendants' motion to invoke the doctrine of qualified immunity should have been made prior to or simultaneously with their initial motion for summary judgment. Because the record as deemed by the Seventh Circuit Court of Appeals was incomplete for summary judgment purposes and because this Court found that same incompleteness prevents it from deciding the qualified immunity question, the Court may upon a complete record, address it again. The Defendants have submitted recent authority from the Sixth Circuit Court of Appeals, *Hagans v. Franklin County Sheriff's Office*, No. 11-3648, __ F.3d __, 2012 WL 3608510, at *5 (6th Cir. Aug. 23, 2012), which discusses facts parallel to this case and upheld the defense of qualified immunity. That submission does not resolve the problem of the incomplete record in this case.

[7] The Court also notes that while their federal appeal was pending, the Plaintiffs brought their state law claims before the Waukesha County Circuit Court, which granted the Town and Czarnecki's motion for summary judgment and dismissed all of the Plaintiffs' state law claims. *See Chet Cyrus et al vs. Town of Mukwonago et al.*, Waukesha County Case No. 2009CV002644 available at http://wcca.wicourts.gov/index.xsl (last visited Aug. 23, 2012).

Waller and Biedrzycki's expert witness reports to establish each expert's expertise and request an extension of the discovery deadline to allow discovery on those reports. The Plaintiffs state that certain opinions of Waller and Biedrzycki were excluded by the Court "on account of their areas of expertise." (Pls' Mot. Extend Dis. & Supplement Expert Reports 3.)

In opposing the motion, the Defendants assert that the motion should be evaluated under Rule 16(b) and its "good cause" standard, rather than the Rule 37(a) and the "justified" or "harmless" standard advocated by the Plaintiffs, and that the Plaintiffs have not shown good cause. They also maintain that it is not clear that any supplement could correct the shortcomings of the original expert opinions that were excluded by the Court.

Under the scheduling order in the action, the Plaintiffs were required to disclose their experts and to submit expert reports by June 8, 2008. (ECF No. 16.) The Plaintiffs disclosed Waller and Biedrzycki. On October 14, 2008, the Defendants filed motions to exclude both experts and for summary judgment. (ECF No. 23 & 28.) The deadline for expert discovery was November 14, 2008. (ECF No. 16.)

On April 24, 2009, the Court issued its Decision and Order granting the Defendants' summary judgment motions. (ECF No. 67.) In that Decision and Order, the Court also granted the Defendants' motions to exclude to the extent that Waller's first, third, and fourth opinions as set forth in his expert report were excluded and Biedrzycki's testimony about the eight factors involved in Cyrus's death was excluded. Although three of Waller's opinions were excluded the Court found that he was qualified by education and experience as a law enforcement expert. (Court's Apr. 24, 2009, Dec. & Order 7.) Biedrzycki's qualifications as a pathology expert were not questioned. (*Id*. at 13.)

The Plaintiffs' appeal from that Decision and Order was limited to the summary judgment rulings on the Fourth Amendment excessive force claims. They did not appeal the ruling on the motions to exclude.

Rule 26(e)(1) of the Federal Rules of Civil Procedure provides for supplementation of disclosures under Rule 26(a) requiring that a party "must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Rule 26(e)(2) states that for expert witnesses "the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition."

As other courts have observed, although the Rule 26(e) does not define the term "supplemental," except in terms of requiring a timely supplement to discovery disclosure that is incomplete or incorrect, it is reasonable to infer that the term does not allow a party to interject new opinions into a lawsuit. *See Trinity Homes, LLC v. Ohio Cas. Ins. Co.,* No. 1:04-cv-1920-SEB-DML, 2011 WL 2261297, at *3 (S.D. Ind. June 8, 2011)(collecting cases). Contrary to the Plaintiffs' characterization, the exclusion of three of Waller's opinions and Biedrzycki's opinion as to the cause of Cyrus's death was not based on their lack of "expertise." Thus, the record in this matter does not suggest any need to supplement their reports as to their expertise. There is no indication that the proposed reports would be proper supplementation under Rule 26(e).

To the extent that the Plaintiffs have inartfully phrased their request and they would like to present revised expert opinions in response to the Court's rulings, continuances or extensions of time with respect to the deadlines for amendments, discovery, and dispositive motions will be granted only upon a showing of "good cause." *See* Fed.R.Civ.P. 16(b)(4); *Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*, 424 F.3d 542 (7th Cir. 2005). "Good cause" under Federal Rule of Civil Procedure 16(b) "primarily considers the diligence of the party seeking amendment." *Id.* at 553 (quoting *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992)). *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011), upheld the finding that the plaintiff had not shown good cause for amendment of a scheduling order, noting that, the plaintiff's primary argument was that he had no reason to know that his complaint was deficient until the defendants filed their motions to dismiss the complaint. However, the appeals court stated that the requirements for surviving a motion to dismiss are "hornbook civil procedure law" and a party should always ask itself whether its complaint sets out a viable claim. *Id*.

By analogy, the standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), as now incorporated into Rule 702 of the Federal Rules of Evidence, are commonly used to challenge the admissibility of expert testimony. Those standards should be considered by any federal court litigant intending to rely upon expert testimony. A need to revise expert opinions following a ruling on their admissibility of expert opinions does not constitute good cause. Therefore, the Plaintiffs' motion to extend discovery and allow supplementation of the expert reports of Waller and Biedrzycki is denied.

The next step in this action is to schedule final pretrial and trial dates. The Court will conduct a telephone scheduling conference with the parties to establish those dates. The Court will initiate the call.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

The Defendants' motion for summary judgment (ECF No. 89) is **DENIED** as to the dismissal of the Plaintiffs' Fourth Amendment excessive force claim against Czarnecki and is **GRANTED** as to the Plaintiffs' Fourth Amendment excessive force claim against the Town; and the Town is dismissed from this action;

The Plaintiffs' motion to extend discovery and allow supplementation of the expert reports of Waller and Biedrzycki (ECF No. 88) is **DENIED**; and

The parties **MUST** participate in a telephone scheduling conference call on **September 11, 2012 at 9:30 a.m.** The Court will initiate the call.

Dated at Milwaukee, Wisconsin, this 29th day of August, 2012.

**BY THE COURT**

_____
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**